UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                                Case No. 6:09-cr-211-ACC-GJK

RAMON CENDANA
  a/k/a Ray Cendana

## SENTENCING MEMORANDUM

The United States, by and through the undersigned Assistant United States Attorney, hereby files this Sentencing Memorandum for the Court's consideration in the sentencing of the defendant, Ramon Cendana:

### Background

On October 21, 2009, a grand jury sitting in the Orlando Division of the Middle District of Florida returned an indictment charging the defendant, Ramon Cendana, with four counts of bank fraud, two counts of wire fraud, and four counts of aggravated identity theft. Specifically, the defendant was charged with a scheme to defraud that involved four executions of defrauding Regions Bank, two executions of using interstate wire communications in defrauding persons who attempted to refinance their homes (Angelica Macatangay and Raul and Generosa Macatangay), and aggravated identity theft in relation to the defendant defrauding Regions Bank because the defendant used the identification information and forged signatures of other persons in order to obtain the loans that underlie those bank fraud counts. On October 22, 2009, the defendant

made his initial appearance in this case.[1]  On January 27, 2010, the defendant entered a plea of guilty to Count Five of the Superseding Indictment, in which Count the defendant was charged with wire fraud, in violation of 18 U.S.C. § 1343.

During the time period relevant to this case, the defendant controlled several companies that he used to assist him in executing his fraudulent scheme.  Particularly, the defendant controlled Cameo Mortgage Group LLC, 1st Class Title Co. LLC, Cameo Investment Group LLC, and Cameo Palms Development LLC.  Through those companies, the defendant solicited persons to invest, primarily, in two projects: (1) a land development project in Kissimmee concerning the Reaves Road property listed in Count One of the Superseding Indictment; and (2) Oyshee Japanese Steakhouse, a restaurant that the defendant opened in August 2008.

When the defendant obtained investor funds, he would execute a promissory note to the investors on behalf of one of his companies.  That promissory note would guarantee a high rate of interest (usually 25%) and periodic interest payments based upon that rate of return.  Often, the defendant obtained the investors' funds by using his mortgage and title companies to refinance the homes of the investors, using the "equity" in those homes to fund the defendant's projects.  However, other investors, such as Angel Rodriguez[2], emptied out their retirement funds to invest in the projects proposed by the defendant.  George Seckinger invested money from his daughter's college fund.

---

[1] On November 18, 2009, the grand jury returned a Superseding Indictment that contained the same charges as the Indictment.  On November 24, 2009, the defendant made his initial appearance as to the Superseding Indictment.

[2] No relation to Herminio and Margarita Rodriguez.

Mario Granado invested both from his savings and from a line of credit on his home that the defendant assisted him in obtaining.

The defendant's projects (whether land development or restaurant) never made any money.  Thus, to fund the interest payments promised to early investors, the defendant used the money of later investors, as well as the money obtained by fraudulent loans, by fraudulent lines of credit, and from the Macatangays.

When the defendant obtained the $800,000.00 loan from Regions Bank related to the purchase of the Reaves Road property, he used about a quarter of those funds to pay off an existing mortgage on that property, and used the remaining approximately $604,000.00 to fund his investment scheme, making "interest" payments to investors, funding the start-up of his restaurant, and paying his own salary and expenses.  Similarly, the defendant used the three home equity lines of credit (HELOCs) he obtained in the names of his brothers and sisters-in-law to fund both "interest" payments and his various projects.  In applying for all four of those loans, the defendant used the personal information of his family members and investors without their knowledge and forged their signatures on the loan documents.[3]

The persons whose identifying information and forged signatures where used to obtain the Reaves Road mortgage began their involvement with the defendant under the impression that they were investors in a land development project.  To that end, Dr. Jose Melendez and Herminio and Margarita Rodriguez each gave the defendant a substantial amount of money to be invested, and provided the defendant with their

---

[3] The defendant has previously been convicted of an offense related to the use of his brother's identification information to apply for a bank loan.  See Presentence Investigation Report, ¶ 41.

identification information in the belief that they were being vetted as qualified investors. However, again, those investment funds were co-mingled with the funds controlled by the defendant and were used primarily to pay other investors "interest" payments and to fund the restaurant, in which Dr. Melendez and the Rodriguez' had no interest. In addition, the defendant used the identification information of Dr. Melendez and Herminio Rodriguez to obtain from Regions Bank two $75,000.00 lines of credit, one in each of their names. Further, the defendant used the identification information of Herminio and Margarita Rodriguez to obtain Bank of America credit cards in their names, and forged each of their signatures on convenience checks drawn off of those credit cards.

In mid-2008, the defendant's investor funds and the funds he obtained through fraudulent loan applications were running out, and the defendant was having financial difficulties related to the expected August 2008 opening of his restaurant. At about that time, the Macatangays - cousins of the defendant - approached the defendant for a legitimate refinancing of their homes because they knew the defendant owned a mortgage company. However, instead of completing the refinancing as promised, the defendant used the funds wired to him by the Macatangays to make "interest" payments to his investors, to fund his projects, and to pay his own salary and expenses - just as the defendant did with the investor funds and the funds obtained through fraudulent loan applications. The facts set forth in the plea agreement as to the Angelica Macatangay-related execution of the scheme are as follows:

> In May 2008, CENDANA, through his involvement with Cameo Mortgage Group LLC and 1st Class Title Co. LLC, entered into an agreement to refinance a residential mortgage for a home owned by victim Angelica Macatangay in California. As a part of the refinancing, CENDANA agreed to pay off and satisfy the existing mortgage loan on the residence that he agreed to refinance. On May 22, 2008, at the direction of CENDANA, Angelica Macatangay executed an

4

>    interstate wire transfer of $175,000 as part of the closing of the purported refinancing.  According to CENDANA, that wire transfer was necessary to bring the "new" loan within the conforming standards for non-Jumbo mortgages, and thus provide Angelica Macatangay with a more favorable interest rate.
>
>    However, CENDANA did not pay off and satisfy the existing mortgage he agreed to refinance, but instead kept the funds he received via interstate wire transfer and used those funds for his own purposes.  After the initial receipt of funds, CENDANA represented to Angelica Macatangay that the loan had "closed," and directed her to make mortgage payments to the companies that CENDANA controlled.  As part of the scheme and artifice to defraud, CENDANA changed the contact information for Angelica Macatangay's original mortgage so that she did not realize that she was entering default on that mortgage for a failure to make payments, even as CENDANA accepted Angelica Macatangay's mortgage payments for the new, refinanced mortgage that did not exist.

Plea Agreement at 12-13 (Doc. 34).

Similarly, the defendant defrauded Raul and Generosa Macatangay.  There, the defendant took a $48,000.00 down payment and a $4,709.51 payment at "closing" for a refinancing that did not actually occur.  The defendant simply used the funds he obtained from his fraud for his own purposes.

The land development project at the Reaves Road property never materialized, and the property is now in default.  Other than a few thousand dollars spent on surveying - which very early in the project revealed that the property was primarily swampland and fit for only a very small-scale development - and some conceptual drawings and marketing materials provided to investors, no funds were used to develop the Reaves Road property, and that property generated no revenue whatsoever.  The restaurant - Oyshee Japanese Steakhouse - shut down soon after it opened and never generated any profits.  Finally, once investor funds dried up and his fraud was discovered by his family, Dr. Melendez, and the Rodriguez', the defendant could no longer make the "interest" payments to his investors, the mortgage payments to the

banks, or the payments for the lines of credit and credit cards he obtained in the names of other persons.

### Discussion

The disputed issues that remain for determination by the Court at sentencing are the determination of the Guidelines loss amount pursuant to USSG §2B1.1(b), as well as the enhancements concerning whether the offense involved ten or more victims, whether the offense involved sophisticated means, whether the offense involved more than $1 million in gross receipts from one or more financial institutions, and whether the offense involved an abuse of a position of trust.

    a.    **Loss and Relevant Conduct**

Pursuant to USSG §1B1.3(a)(1)(A), a defendant's base offense level, specific offense characteristics, and adjustments in Chapter Three of the Guidelines, "shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

In addition, pursuant to USSG §1B1.3(a)(2), "solely with respect to offense of a character for which §3D1.2(d) would require grouping of multiple counts," the base offense level, specific offense characteristics, and other adjustments include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan." Section 1B1.3(a)(2) "does not require the defendant, in fact, to have been convicted of multiple counts," only that the charged offenses would group had the

6

defendant been convicted of those counts. USSG §1B1.3(a)(2), comment. (n.3). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." USSG §1B1.3(a)(2), comment. (n.9(A)). Further, the Background Notes to USSG §1B1.3(a)(2) explain that the "common scheme or plan" language of USSG §1B1.3(a)(2) "provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud, and drug offenses for which the guidelines depend substantially on quantity . . . ."

Due to the offense of conviction in this case, USSG §2B1.1 provides the starting point to calculate a defendant's total offense level under the Guidelines. A primary consideration in any determination of offense level pursuant to §2B1.1 is "loss." As a general rule, "loss is the greater of actual or intended loss." USSG §2B1.1, comment. (n.3(A)). "'Actual loss' means the reasonable foreseeable pecuniary harm that resulted from the offense." Id. at n.3(A)(i). By contrast, intended loss "means the pecuniary harm that was intended to result from the offense." Id. at n.3(A)(ii). Reasonably foreseeable pecuniary harm "means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. at n.3(A)(iv). Further, the Court "need only make a reasonable estimation of loss." Id. at n.3(C). "In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." Id. at n.3(E).

It is the position of the government that the Guidelines loss amount pursuant USSG §2B1.1(b) is $1,973,972.72, which sum is the total amount of funds obtained by the defendant by fraud. This amount includes the total amount obtained by the defendant from: the Macatangays; Herminio and Margarita Rodriguez (including the Bank of America credit cards fraudulently obtained by the defendant in their names); Dr. Jose Melendez; Regions Bank (including the $800,000.00 loan on the Reaves Road property, the two $75,000.00 lines of credit, and the HELOCs fraudulently obtained in the names of the defendant's brothers and sisters-in-law ($40,000.00, $28,000.00, and $40,000.00)); George Seckinger; Angel Rodriguez; and Mario Granado.

It is the understanding of the government that the only amounts of loss in dispute at this point are the $800,000.00 loan from Regions Bank on the Reaves Road property and the investments of George Seckinger, Angel Rodriguez, and Mario Granado.

### i.    $800,000.00 Reaves Road Property Loan

As to the $800,000.00 Reaves Road property loan, the defendant has contended that the property securing the loan is worth well in excess of Regions Bank's outstanding mortgage. Thus, if Regions Bank forecloses on the property it will suffer no actual loss. Further, the defendant has asserted that he is in the process of negotiating with Regions Bank to have the loan modified or assumed by another person, again, resulting in no loss to Regions Bank if the loan is then paid off. While each of those contentions may be true, the government believes that it is still appropriate under the Guidelines to score the defendant for the entire $800,000.00 as intended loss. See, e.g., United States v. Dinnall, 313 Fed. Appx. 241, 244-45 (11th Cir. 2009) (affirming the district court's calculation, for purposes of §2B1.1, the entire $800,000.00 requested by

a defendant in a fraudulent loan application case); United States v. Tedder, 81 F.3d 549, 550 (5th Cir. 1996) ("The amount of loss in a fraudulent loan application case is factually dependant.  Where the defendant intends to repay the loans, then actual loss, rather than intended loss, is the appropriate basis for calculating loss under §2F1.1.  However, where the defendant does not intend to repay, and the actual loss is less than the intended loss, only because law enforcement official thwarted his plans, then the full intended loss is the appropriate basis for calculation.") (internal citations omitted).

The defendant obtained the $800,000.00 loan by using the personal identification information of other persons without their knowledge or consent and by forging their names on the loan and closing documents.  This case should be distinguished from those cases in which a defendant, for example, makes false statements as to their income or liabilities in order to obtain a mortgage.  See, e.g., United States v. Menchino, 989 F.2d 438, 440-42 (11th Cir. 1993) (deducting the value of the secured asset and calculating the loss amount as the actual net loss to the bank in a case where a loan was obtained by a fraudulent appraisal of the underlying asset).  Here, the defendant did not obligate himself personally as to the loan on the Reaves Road property, and is free to walk away from the mortgage at any time, having already used for his own purposes approximately of $604,000.00 of the proceeds from the loan.[4]

While it may be true that the defendant is now attempting to negotiate the loan with Regions Bank to mitigate the damage he has caused, it is also true that the defendant is doing so knowing that he has been caught - the victims reported the

---

[4] As an alternative, the Court could use the gain the defendant obtained from the loan ($604,000.00) as opposed to the face value of that loan.  See USSG §2B1.1, comment. (n.3(B)).

defendant's fraud to law enforcement soon after they discovered what the defendant had done.  Further, the defendant's attempts to negotiate for modification of the loan are likely being hampered by the fact that the defendant has no documented connection to the loan he is attempting to modify.  Moreover, the defendant has no ability (no creditworthiness and no assets) to assume the loan himself, so he necessarily is attempting to have yet another third party assume responsibility for the loan.

In addition, in determining whether the loan proceeds from the Reaves Road property loan should be scored as loss, the Court should look at what the defendant actually did with those funds, and the deal underlying that transaction.  On the surface, the Reaves Road transaction appeared to be an $800,000.00 mortgage loan to purchase the Reaves Road property.  In fact, after the loan proceeds were used to pay-off an approximately $200,000.00 existing mortgage on the property, the defendant (even though he, through his unwitting nominees, was the "buyer" of the property) kept the remaining approximately $604,000.00 and funneled that money directly into his investment companies, using the money for "interest" payments and other purposes.  The actual sellers of the land simply received a promise of payments to come, both exorbitant interest payments and, eventually, principle payments.  The "interest" payments of course stopped being paid once the defendant's scheme unraveled.

Accordingly, the Court should score the entire $800,000.00 as loss because of the nature of the fraudulent applications, and because he actually used for his own purposes the vast majority of the loan proceeds.

ii. <u>Investments of Angel Rodriguez, George Seckinger, and Mario Granado</u>

The government takes the position that the investments of Angel Rodriguez, George Seckinger, and Mario Granado are properly scored as loss in this case. Each of these persons were solicited to invest in the defendant's projects, each was promised unrealistic interest payments, and each person's money was used to fund the "interest" payments of other investors. Again, the "interest" payments ran out as the scheme unraveled.

Based upon the defendant's solicitations, Angel Rodriguez withdrew $206,000.00 from his 401(k) and invested those funds with the defendant's companies at a promised rate of return of 25% per year. Angel Rodriguez believed he was investing in the Reaves Road development project. Similarly, George Seckinger invested $20,000.00 from his daughter's college fund, again at a promised rate of return of 25%. Finally, Mario Granado invested $60,000.00, drawn from both his savings and from a home equity line of credit on his home that the defendant obtained for him, again, Granado executed promissory notes with the defendant's companies that promised 4%, 25.5%, and 48% rates of return.

**b. Number of Victims**

Pursuant to USSG §2B1.1(b)(2)(A), a two-level enhancement is appropriate if the offense involved 10 or more victims. "Victim" is defined as "any person who sustained any part of the actual loss," and "person" includes individuals and corporations. USSG §2B1.1, comment. (n.1). The number of victims depends on the loss calculation, specifically the actual loss, and, thus, a sentencing court must connect the number of victims to the actual loss. <u>United States v. Foley</u>, 508 F.3d 627, 634 (11th Cir. 2007).

The defendant's scheme involved many persons who provided the defendant with funds, often with the assistance of the defendant in drawing equity from their residences. Some of those persons who were not counted as "victims" of the fraud are the defendant's close friends and associates, many of whom were employed by the defendant at his restaurant, had inside knowledge of the defendant's actual projects, and have now written letters in support of the defendant.

However, for sentencing purposes, the government has identified fifteen victims of the defendant's scheme that were defrauded:

<u>Victims 1-3: Angelica Macatangay and Raul and Generosa Macatangay</u>

The Macatangays entrusted the defendant with their money believing that the defendant was assisting them with a traditional refinancing of their homes. Instead, the defendant used the Macatangays' money to make "interest" payments to his investors, to fund his restaurant project, and for other purposes.

<u>Victims 4-5: Herminio and Margarita Rodriguez</u>

Like many of the victims in this case, the Rodriguez' came as investors to the aborted land development project, and then had their investments used by the defendant to make "interest" payments to other investors, to fund the restaurant project, and for other purposes. In addition, the defendant applied for the Reaves Road loan, a line of credit, and credit cards in the names of the Rodriguez', all the while using their identification information without their knowledge and forging their signatures.

<u>Victim 6: Dr. Jose Melendez</u>

Dr. Jose Melendez came in as an investor at the same time and with the same purpose as the Rodriguez', as an investor to the land development project. Dr.

Melendez' investment was used to make "interest" payments to other investors, to fund the restaurant project, and for other purposes. In addition, the defendant applied for the Reaves Road loan, a line of credit, and a credit card in the name of the Dr. Melendez, all the while using his identification information without his knowledge and forging his signature.

### Victims 7-10: Rainier & Janice Cendana and Rogelio & Nicole Cendana

The defendant's brothers and their wives were investors with the defendant, and the defendant's brother Ranier Cendana provided the defendant with assistance in running the legitimate aspects of his companies. However, in order to fund "interest" payments, to fund the restaurant project, and for other purposes, the defendant used their identification information and forged their signatures on loan documents allowing the defendant to obtain three HELOCs totaling $108,000.00 from Regions Bank.

### Victims 11: Regions Bank

Regions Bank is also a victim of the defendant's scheme. The defendant obtained $1,058,000.00 from Regions Bank by applying for loans and lines of credit using the identification information and forged signatures of the victims discussed in the foregoing paragraphs. All of the loans and lines of credit at issue are now in default.

### Victims 12-14: Angel Rodriguez, Mario Granado, and George Sedgwick

Angel Rodriguez, Mario Granado, and George Sedgwick came as investors to the land development project, and then had their investments used to make "interest" payments to other investors, to fund the restaurant project, and for other purposes. Other than some "interest" payments, these investors have entirely lost their funds.

### c. Sophisticated Means

Pursuant to USSG §2B1.1(b)(9)(C), a two-level enhancement is appropriate if the offense involved sophisticated means.  "'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution of concealment of an offense."  USSG §2B1.1, comment. (n.8(B)).

The defendant operated what amounted to a Ponzi-type scheme, soliciting investors, promising high rates of return on investments, and then paying early investors with the investments of later investors.  However, in order to perpetuate and conceal his scheme, the defendant went beyond that simple model.  Indeed, when investor funds ran low, the defendant used the identification information of his investors to apply for loans and lines of credit in the names of his investors.  Further, near the end of his scheme, as both investor funds and fraud proceeds ran low, he used the companies he controlled to create fictitious mortgage closings and to obtain and use the money the Macatangays entrusted to him.  All the while, the defendant utilized continuous transfers of funds between his companies' bank accounts that he termed "capital infusions" that appear to have no purpose other than to create the appearance of cash flow and ongoing business operations.

Indeed, even looking solely to the Angelica Macatangay "loan," the defendant utilized sophisticated means.  Most critically, the defendant utilized all the indicia of his mortgage business to make Angelica Macatangay believe that she was applying for a legitimate loan, and that the loan had, in fact, closed.  This included the execution of all the standard loan application and closing documents; even going so far as to have an appraisal of her home.  The defendant then had Angelica Macatangay pay him

14

"mortgage payments" on the new, non-existent loan, following up with "payment reminders" from his non-existent customer service department.  In order to conceal and perpetuate the fraud, the defendant changed Angelica Macatangay's login and contact information with her original mortgage lender, and had her original loan correspondence redirected to the defendant's office, which correspondence eventually indicated that Angelica Macatangay was in default for lack of payment.

      d.      **More Than $1 Million in Gross Receipts from a Financial Institution**

Pursuant to USSG §2B1.1(b)(14)(A), a two-level enhancement is appropriate if the defendant derived more than $1,000,000.00 in gross proceeds from one or more financial institutions as a result of the offense.  "'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense."  USSG §2B1.1, comment. (n.11(B)).  Here, the defendant's scheme resulted in him obtaining $1,058,000.00 from Regions Bank.  See, e.g., United States v. Mingo, 340 F.3d 112 (2d Cir. 2003) (in applying this enhancement, there should be no offset for the value of the collateral pledged to secure any loan; to the contrary, the value of the underlying property should be taken into consideration in determining whether the defendant obtained more than $1 million in property).

      e.      **Abuse of a Position of Trust**

Pursuant to USSG §3B1.3, a two-level enhancement is appropriate if the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense.  A position of private trust refers to a position "characterized by professional or managerial discretion."  USSG §3B1.3,

comment. (n.1).  The Eleventh Circuit has explained the application of this enhancement as follows:

> "[T]he abuse of trust enhancement applies ... where the defendant has abused discretionary authority entrusted to the defendant by the victim . . . ."  As we explained in <u>United States v. Garrison</u>, 133 F.3d at 837, and <u>United States v. Barakat</u>, 130 F.3d 1448, 1454 (11th Cir.1997), "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense."  The "offense" refers to the offense of conviction.  "Significant facilitation" in committing the offense of conviction is present when "the person in the position of trust has an advantage in committing the crime because of that trust and uses that advantage in order to commit the crime."

<u>United States v. Smith</u>, 231 F.3d 800, 819 (11th Cir. 2000) (internal citations omitted).  As a separate and additional ground for application of this enhancement, the commentary to §3B1.3 states that the enhancement is appropriate for: "A defendant who exceeds his or her position in order to obtain . . . or use without lawful authority, any means of identification."  USSG §3B1.3, comment. (n.2(A)).

Here, the defendant was placed in a position of private trust not only through his professional position as a mortgage broker to the Macatangays, but also as the manager of the companies utilized to execute his scheme and, thus, as the person entrusted with the funds of the various investors.  Indeed, the Macatangays entrusted the defendant with exercising his discretion to find and secure the financing they sought.  In doing so, for example, Angelica Macatangay entrusted the defendant with her personal information, her money, and her login information.  The defendant used that login information without lawful authority to conceal his scheme both by changing that login information and by changing the address to which her original mortgage lender sent correspondence.  In addition, the defendant, through his management and control of his mortgage company and investment companies, obtained the personal information

of the Rodriguez' and Dr. Melendez, and then also used that information without lawful authority by using it without their knowledge to apply for loans and lines of credit. Accordingly, the §3B1.3 enhancement applies to the defendant on two, independent grounds.

Respectfully submitted,

A. BRIAN ALBRITTON
United States Attorney

By:    *s/ Daniel C. Irick*
Daniel C. Irick
Assistant United States Attorney
Florida Bar No. 0802301
501 West Church Street, Suite 300
Orlando, Florida  32805
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail:          daniel.irick@usdoj.gov

U.S. v. RAMON CENDANA                              Case No. 6:09-cr-211-Orl-ACC-GJK

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    R. Lee Dorough

    *s/ Daniel C. Irick*
    Daniel C. Irick
    Assistant United States Attorney
    Florda Bar No. 0802301
    501 West Church Street, Suite 300
    Orlando, Florida  32805
    Telephone:   (407) 648-7500
    Facsimile:    (407) 648-7643
    E-mail:         daniel.irick@usdoj.gov