```
 1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3                   Docket No. 6:09-cr-211

 4      . . . . . . . . . . . . .
        UNITED STATES OF AMERICA    :
 5                                   :          Orlando, Florida
                   Plaintiff         :          April 28, 2010
 6                                   :          9:30 a.m.
                        v.           :
 7                                   :
        RAMON CENDANA                :
 8                                   :
              Defendant              :
 9      . . . . . . . . . . . . .

10

11                   TRANSCRIPT OF SENTENCING
                 BEFORE THE HONORABLE ANNE C. CONWAY
12                   UNITED STATES DISTRICT JUDGE

13

14      APPEARANCES:

15

16      For the Plaintiff:  Daniel Irick

17

18      For the Defendant:  Lee Dorough

19

20      Court Reporter:     Sandra K. Tremel, RMR/CRR
21                          407-245-3110

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.
```

P R O C E E D I N G S

1

2 THE COURT:  Case number 2009-211 United States

3 v. Ramon Cendana.

4 Could we have appearances, please?

5 MR. IRICK:  Good morning. Daniel Irick for the

6 United States with me is the postal inspector Lane

7 Rutledge and United States Secret Service Jeff Starnes.

8 MR. DUROUGH:  Good morning.  Lee Dorough for

9 Mr. Cendana who stands to my right.

10 THE COURT:  Good morning, Mr. Cendana.

11 THE DEFENDANT:  Good morning.

12 THE COURT:  On January 27th, 2010, you entered a

13 plea of guilty to count five of the superseding indictment

14 charging with you wire fraud in violation of Title 18

15 United States Code sections 1343 and 2.  We have now

16 reached the stage in the proceeding where it's my duty to

17 address several questions to you and your attorney as well

18 as counsel for the government.

19 Have you had the opportunity to read and discuss the

20 presentence report with your attorney?

21 THE DEFENDANT:  Yes, Your Honor.

22 THE COURT:  All right.  Counsel, do you wish to

23 be heard on your objections?

24 MR. DUROUGH:  Yes, Your Honor.  We have -- and I

25 wish to apologize to the Court about my presentencing

1    memorandum.  There was actually two PSIs done.  We had

2    objection to the first one.  We had a meeting.  When I got

3    to the second PSI was only about two or three days before

4    I had to respond to it in the presentence memorandum, so

5    it wasn't possibly as complete as I wanted it.

6         Yes, Your Honor, there were several objections we

7    made.  There are no objections to any of the facts set

8    forth as to the count that he pled guilty to.

9         We have objected to the government's position taken,

10   that sophistication of the manner, the number of victims,

11   the -- some other issues that we have raised where we

12   think the guidelines should be somewhere between 16 and 19

13   on the offense level instead of 28 found by the

14   government.

15        Part of this, Your Honor, arises out of the fact that

16   the information received on a number of the issues had to

17   deal with an amount of the computation of the losses and

18   the intended losses.  In my filings with the Court, I have

19   given the Court the mortgage to Regions Bank which the

20   government is holding at a loss of $800,000.  I gave the

21   Court just the first page of the mortgage and the last

22   page that was signed.  The mortgage is legally

23   enforceable.  There is no issue that the mortgage is

24   legally enforceable, and while presently is in default, we

25   have found no information that the property value on the

1   land that the mortgage is subject to grossly exceeds the

2   value of the mortgage.

3       In fact, the property is presently listed for sale at

4   $1.6 million through Atlanta Realty.  My client did sign

5   the mortgage.  And contrary to the government's position,

6   he cannot just walk away from that obligation.

7       We understand that there were notes signed but I

8   believe one was Jose Mendez.  Mr. Cendana has admitted he

9   signed Mr. Mendez's name to that note -- I'm sorry --

10  Melendez.  I said Mendez.  And but he -- that he says it

11  was with the permission of that person.

12      And the reason that we -- if you go through all the

13  papers that were filed by the government, obviously you

14  can't -- Dr. Melendez had sent to him his income tax

15  returns, his ID, everything to show how he could get

16  credit on that.  Dr. Melendez wouldn't have sent that

17  information if he didn't know there was going to be a loan

18  taken out on it.

19      As to two of the other people they list as victims,

20  Ranier --

21          THE COURT:  Well, we need take these things one

22  at a time.

23          MR. DUROUGH:  Okay.

24      Your Honor, that's why we say there is no loss or

25  intended loss on the $800,000 on Regions Bank.

 1     We have supplied the mortgage to the Court.  And in

 2  fact, Mr. Cendana had up to January of this year, was

 3  still working with Regions Bank trying to find a way to

 4  refinance the $800,000 so that payments could be begun

 5  again through other people that might be willing to invest

 6  in the property.

 7          THE COURT:  Are there any payments being paid

 8  right now to the bank?

 9          MR. DUROUGH:  No.  It is in default at this

10  time.

11          THE COURT:  All right.

12     Mr. Irick.

13          MR. IRICK:  Yes, Your Honor.

14     The government's position is that the entire amount

15  of the loan should be scored.  We set out our position in

16  our sentencing memorandum.  I'll go through that.  First

17  of all, the loan was obtained through identity theft and

18  that is one of the other key arguments here.  This is not

19  a loan where the defendant -- and this should be

20  distinguished from those cases where a defendant simply

21  exaggerates his income or minimized his liabilities and

22  committed fraud in that manner in order to get a loan.  In

23  those cases it's well established there should be a setoff

24  against the loss.

25     So that is the first prong of our argument.

1    The second, we would ask the Court to look at what

2  was done with this money.  This was a $800,000 loan.  Of

3  that amount, approximately 200,000 was used to pay off an

4  existing mortgage on the property.  The other $604,000,

5  Your Honor, was simply used by the defendant to fund his

6  companies.

7    So, Your Honor, there should be an alternate gain

8  argument as well as intended loss.  If you do a gain

9  calculation, Your Honor, we believe it should be 604,000.

10 If I may I approach, Your Honor.  We compare the chart to

11 how that money was spent.

12          THE COURT:  All right.  You may.

13          MR. IRICK:  Yes, Your Honor.  This would be

14 marked as Government's Exhibit 1.  I previously provided

15 it to defense counsel.

16   If you look at the deposit on this chart, the first

17 deposit is the flex line amount.  That's a fraudulently

18 obtained flex line pertaining to identity fraud in this

19 case.  We will take that separately.

20   The wire transfer for $604,000, that's directly a

21 wire transfer related to this mortgage.  This $604,000 was

22 first transferred to an escrow account of a company

23 controlled by the defendant and then transferred into this

24 account which is Cameo Palm Development bank account, a

25 company he controls.  That money was then spent, as you

1    can see here.  The first expense listed is CIG.  That's

2    Cameo Investment Group.  That is a company controlled by

3    the defendant.  The other expenses, Pedro Gonzalez, these

4    were interest payments paid to the original land owner in

5    this case.  Pedro Gonzalez is a land owner.  He was

6    promised interest payments related to him selling the

7    defendant his property.

8         As can you see further, there's a list of persons,

9    most of those persons are investors in the defendant's

10   corporations.  You see Lexus of Orlando.  That's a car

11   owned by the defendant.  You see 1st Class Title.  Again,

12   a company controlled by the defendant.  CMG, a company

13   controlled by the defendant.  And, Your Honor, it goes on

14   and on.  You can see it goes to include travel, office

15   maintenance, retail expenses, et cetera.

16        So Your Honor, believe that either it should be an

17   entire $800,000 amount based on the identity fraud used to

18   obtain this loan or at least should be $604,000 gain to

19   this defendant, because unlike a normal case where

20   deposits were obtained -- mortgage was obtained to defraud

21   and that mortgage money is paid to a legitimate seller,

22   it's not the case here.  In this case, the money was used

23   by this defendant to further his schemes.

24             THE COURT:  Would you like to respond?

25             MR. DUROUGH:  Yes, Your Honor.

1      This is the first time I have seen this spreadsheet

2  of this bank account.

3          MR. IRICK:  If I may, Your Honor.  This

4  spreadsheet was provided in discovery.

5          MR. DUROUGH:  Well, I understand. I'm saying

6  it's the first time I reviewed it in this area.  There

7  were approximately 10- to 12,000 pages provided in

8  discovery in this case.

9      But in any event, Your Honor, the money that came

10  from the refinancing of the property, none of these

11  investors were involved in just one investment.  Cameo

12  Investment Group had, as you can see even the government

13  has agreed, had the 110 acres, which the $800,000 mortgage

14  was on.  It had various investors also in townhomes.  It

15  had various investors also in a steakhouse which we will

16  be talking about later.

17      So a lot of this money it was gone through was paying

18  back investors, paying back loans.  It was also used to

19  pay interest payments.  It was also used to pay the

20  operating expenses of the investment group.  There were

21  several companies.  There was the mortgage company.  There

22  was the Cameo Investment, Cameo Palms Development, LLC.

23  All of these things were used to pay back those types of

24  costs and investment on it.  And Mr. Cendana is saying

25  that, for example, there's a $19,000 -- on the Lexus, he

1  said that was his parents' money that was put into his

2  account that he paid off.  It was not part of this

3  $800,000.

4      But in any event, we're back to this issue on the

5  identity theft of Jose Melendez for one person.  And

6  produced in the discovery and also produced to me by my

7  client, Dr. Melendez had sent him all of these financials

8  to obtain loans because this was a large project.  The

9  government is taking the position that nothing was done on

10 this project.  We take the position that there were

11 surveys done.  They were trying to get topographical

12 studies done.  This was all the occurring in 2007 when the

13 market started to go down.  At one time there was an

14 appraisal appraising this property well over $2 million in

15 value.  There had been topographic studies done to

16 determine how much of the property could in fact be built

17 on.

18     So the issue of the identity theft with Dr. Melendez

19 is one that we still dispute.  But not only that, there

20 was no intended loss to anyone on this.  The property

21 grossly exceeded the $800,000 mortgage on it.

22     Mr. Gonzalez, who was the owner of the property, got

23 his first mortgage paid off.  He got other payments on the

24 property, both before and after the $800,000 mortgage in

25 order to keep the deal in place.

1    But when the property value plummeted, they in fact

2    renegotiated with Mr. Gonzalez a purchase price, as I

3    recall on the property, down to $1.2 million because the

4    property had dropped in value due to the general market

5    conditions.

6    But in any event, that is why we're disputing the

7    $800,000 as an intended loss.

8         THE COURT:  All right.  I find that the

9    government has proven by a preponderance of evidence a

10   loss of -- what is the total amount minus the loan that

11   was paid off?

12        MR. IRICK:  Your Honor --

13        THE COURT:  The first mortgage 600,000

14   something.

15        MR. IRICK:  $604,238.36.

16        THE COURT:  That's the amount of funds that were

17   remaining that were used for purposes other than that

18   project.

19        MR. IRICK:  Yes.

20        THE COURT:  All right.

21   You have no dispute as to the Angelica --

22        MR. DUROUGH:  Mac --

23        THE COURT:  Macatangay or Raul Macatangay.

24        MR. DUROUGH:  That is correct, Your Honor.

25        THE COURT:  And are you disputing the Herminio

```
 1   and Margarita Rodriguez, 258,394.?
 2            MR. DUROUGH:  Yes, Your Honor.  We were
 3   disputing that.  Mr. Cendana will address that.  But we're
 4   disputing that loss.  Again, these were promissory notes
 5   signed by Cameo Investment Groups to these individuals.
 6   They came in -- and in the documents we have shown you,
 7   these people were actually giving managing member
 8   positions within the investment group.
 9            THE COURT:  So are you saying that these
10   individuals are part of the scheme to defraud?
11            MR. DUROUGH:  No, I'm not saying they're part of
12   a scheme to defraud.  I'm saying they were investors who
13   invested their money.
14            THE COURT:  All right.  And so they had
15   knowledge of --
16            MR. DOROUGH:  They had knowledge of what was
17   going on.
18            THE COURT:  Everything that was going on --
19            MR. DUROUGH:  Mr. Cendana will address that
20   there were meetings where these people were present.  They
21   were involved in phone conversations with this.  There was
22   the steakhouse.
23       We -- in the notice of filing I showed you where
24   these people were managing members in the 110-acre
25   development.  They were -- I mean Cameo.  I have shown
```

1  where they were managing members in the Ocean Steakhouse.

2  They were involved in these ongoing operations.  They

3  couldn't be involved in any fraud because they weren't

4  defrauding themselves, but they put their money in.

5      As we're sitting here today, Your Honor, on this side

6  of the courtroom, we have any number of other investors

7  who are here on behalf of Mr. Cendana who invested large

8  amounts of money in these investments and they are not

9  saying they were defrauded.  They are saying they made an

10  investment.  It did not work out.  It didn't fly.

11      And so we are disputing these large amounts of money

12  from people that were actually involved in the

13  day-to-day -- well, not day-to-day -- but people that were

14  involved and had meetings with them, they were discussed

15  with them, they knew what they were getting into.  They

16  knew the investments they were making.  They -- they're

17  promissory note loans.  I mean, they don't -- I know the

18  government feels like a promissory note promising

19  24 percent per annum is somehow outrageous.  These are not

20  Ponzi scheme notes where it's 15 or 20 percent a month.

21  They're based on yearly incomes.  Some of the notes were

22  actually reduced interest rates at a later date when they

23  were redone.

24      So we're disputing these people were, quote,

25  defrauded.  They may have had expectations of a return,

1  but the returns didn't occur because of the situation with

2  the market.  You couldn't sell the 110 acres at that time.

3  It couldn't be developed at that time.  The credit crunch

4  comes in 2007, 2008, and you can't get loans to develop

5  the property.

6       And part of the problem we're having here from the

7  defense side of the table is, Your Honor, we read this

8  discovery, we read these interviews and people lost money

9  so they believe they were defrauded.  And as I say, I have

10  got people here, Carmen Santiago, she invested $100,000.

11  She doesn't feel she was defrauded.

12            THE COURT:  All right.  Well, that's not the

13  point.

14       Mr. Irick, what evidence do you have that Herminio

15  and Margarita Rodriguez were victims with a loss of

16  $258,394?

17            MR. IRICK:  Yes, Your Honor.  If I may approach

18  to provide another chart.

19            THE COURT:  Yes.

20            MR. IRICK:  It will assist us.

21       Your Honor, I provided you with what's been marked

22  for identification as Government's Exhibit No. 2.  This is

23  an itemized loss amount for all of the loss we believe is

24  appropriate in this case, but I believe it will assist us

25  in looking at the Rodriguez amounts at this time.

1    Your Honor, looking at the Rodriguez amounts, there's

2    really two classes of amounts there.  There is the amount

3    that were invested by Rodriguezes and there's an amount

4    obtained through fraud.

5    As to the amounts obtained by investments by the

6    Rodriguezes, it's the government's position, Your Honor,

7    that these amounts were obtained by fraud.  They believe

8    they were investing in a development project that did not

9    happen, that did not occur, did not exist.

10    The defendant has made representations concerning

11    that there was an ongoing development of 110 acres

12    property.  In fact, based upon the government's review of

13    all the bank records in this case, the only expenditures

14    related  to that property are a survey which showed that

15    approximately 25 acres was developable and that is

16    actually when the amount of property went from

17    approximately $2.3 million to $1.1 million.

18    And second, Your Honor, market materials,

19    architectural rendering relating to the property.  This

20    was a de minimus amount that was not even close to $50,000

21    in total.  However, the defendants obtained hundreds of

22    thousands of dollars from investors believing they were

23    investing in an ongoing project.  It was not ongoing.

24    That's the situation with the Rodriguezes.

25    Now, Your Honor, if you look at this chart, there's a

1    $75,000 flex line as to Herminio Rodriguez dated 8-8-2007.

2    That was obtained through identity theft, Your Honor, with

3    Regions Bank.  This defendant forged the names of those

4    defendants on the loan applications, used their personal

5    identifying information to obtain this flex line.  All

6    amounts of that were used.  This is a flex line -- excuse

7    me, we'll get to that in a second, Your Honor.

8              THE COURT:  Do you have a witness that can

9    testify to this?

10             MR. IRICK:  As to the forging the signatures?

11             THE COURT:  Yes.  As to this whole issue

12   relating to the Rodriguez.

13             MR. IRICK:  Your Honor, we have the agent

14   available to testify.

15             THE COURT:  Well, then we better -- since

16   they're disputing, it we need to take evidence?

17             MR. IRICK:  Yes, Your Honor.  I would call

18   Special Agent Jeff Seeger -- Jeff Starnes.  Excuse me,

19   Your Honor.

20                        **(WITNESS SWORN)**

21             THE COURT:  You all can take a seat while he's

22   testifying.

23             MR. IRICK:  Your Honor, should I go through all

24   the loss amounts again?

25             THE COURT:  Right.  Ones that are in dispute.

```
 1              MR. IRICK:  Your Honor, may I approach the
 2   witness to provide him with the charts?
 3              THE COURT:  Yes.
 4                       DIRECT EXAMINATION
 5   BY MR. IRICK:
 6   Q    All right.  Special Agent Starnes, for the record who
 7   do you work for?
 8   A    United States Secret Service.
 9   Q    Were you involved in the investigation in this
10   matter?
11   A    I am.
12   Q    Now, I provided you with what's been marked for
13   identification as Government's Exhibit No. 2.  Do you have
14   that?
15   A    I do.
16   Q    All right.  Let's get right to the point here.  Let's
17   look at the entries for Herminio Rodriguez.  Do you see
18   those on the chart?
19   A    I do.
20   Q    All right.  Would you discuss the circumstances
21   now -- before I get there.  Have you spoken with
22   Mr. Herminio Rodriguez?
23   A    Yes, I have.
24   Q    Have you spoken with Margarita Rodriguez?
25   A    Yes, I have.
```

1  Q    Have you also reviewed the records related to all

2  these amounts in this chart since -- including bank record

3  and loan applications?

4  A    Yes, I have.

5  Q    All right.  Can you -- according to Herminio

6  Rodriguez, can you explain the circumstances surrounding

7  the $7,000 wire transfer and the first line item there?

8  A    That was an investment that Herminio and Margerita

9  Rodriguez made later on during this timeline.  It went to

10  the defendant.

11  Q    And as to all these amounts, this amount included,

12  that were actually investments, according to the

13  Rodriguezes, what do they believe they were investing in?

14  A    They believed they were investing in a condominium

15  project in Kissimmee, Florida.

16  Q    And was that the property -- was that the project

17  related to the Reaves Road property?

18  A    That is correct.

19  Q    Have you reviewed the bank records of the defendant's

20  companies in this case?

21  A    I have.

22  Q    And what expenditures were made relating to the

23  development of that property?

24  A    Very minimum.  Expenses were made to pay for surveys,

25  architectural renderings and marketing supplies.

1  Q    Let's go to the next entry --

2          THE COURT:  What are the approximate amounts

3  that were spent on the survey, the architectural and

4  the --

5          THE WITNESS:  I don't have the exact amount.  I

6  know it was less than 50,000, Your Honor.

7  BY MR. IRICK:

8  Q    Let's look to the next two entries.  There's $3,800

9  entry and $300 entry.  Are these investments by these

10  victims as well?

11 A    Yes, they are.

12 Q    Now let me turn your attention to the $75,000 flex

13 line amount.  What is that?

14 A    That is a line of credit with Regions Bank that was

15 purported to be acquired by Herminio Rodriguez.

16 Q    And have you spoken with Herminio Rodriguez about

17 this and what did he say?

18 A    I have.  He said that he didn't find out about this

19 until he ran his credit some time after the fact, but he

20 had no -- during the time that this was taken out, he did

21 not know about it.  He looked at the signature on the

22 document.  He said it was not his signature.

23 Q    Did you show him the applications and it's not his

24 signature, correct?

25 A    We did and he said it was not his signature.  He said

1  he was not aware of it.

2  Q    Was Herminio Rodriguez aware of how the defendant

3  obtained his personal information?

4  A    Herminio Rodriguez was a qualified investor with the

5  defendant.  He invested money in the land project.  He had

6  to give his social security card, copies, social security

7  card, his driver's license, tax returns and things of that

8  nature.  He gave them to the defendant so the defendant

9  could use basically his investor's information to say I

10  have investors in this project, so then the defendant

11  could go out using his own name and acquire loans based on

12  that property.

13  Q    Did the Rodriguezes ever believe they would actually

14  be obligated on any loans?

15  A    No, they did not.

16  Q    Now, let's take a look at the next entry.  It's

17  $29,821.98 Bank of America credit card.  What is that

18  according to the Rodriguezes and your review of the bank

19  records?

20  A    That is a credit card again that's opened in the name

21  of Herminio Rodriguez in 2007.  Again, that is something

22  that Herminio Rodriguez and his wife Margarita Rodriguez

23  had no knowledge that that was open.  They contest that.

24  They did not sign the opening documents for that credit

25  card nor did they have any knowledge of it.

```
1   Q    And how was money used from that credit card?

2   A    Money from the two -- well, that credit card

3   specifically is also related to the credit card from

4   Margarita Rodriguez further down on that -- on the chart.

5   Basically convenience checks were written off the credit

6   card, and then those convenience checks were then

7   deposited into accounts controlled by the defendant.

8   Q    And you did show those convenience checks to Herminio

9   and Margarita Rodriguez?

10  A    We did.

11  Q    And what did they say about the signatures on the

12  those checks?

13  A    They did not belong to them.

14  Q    Now, there are three entries there, $100,000, 12,000

15  10,000.  Are those all investments?

16  A    They are.  Those are the initial investments that the

17  Rodriguezes made in the Deland project off Reaves Road.

18  Q    If we continue down, what are the two financial

19  entries there for $25,000 and $20,000?

20  A    Those are additional investments made by the

21  Rodriguezes, Margarita and Herminio Rodriguez, into the

22  land project.  It's just under their company name.  But

23  those are checks written by Margarita and Herminio

24  Rodriguez.

25  Q    Under the same belief that they were investing in
```

1    that Kissimmee land project?

2    A    That's correct.

3    Q    Now, what's interesting about this $25,000 wire

4    transfer there?  Is there any circumstances surrounding

5    that with other victims in this case?  Specifically George

6    Seckinger, Angel Rodriguez?

7    A    I'm sorry.

8    Q    Was that the payback of this $25,000?

9    A    I'm sorry.  Yes.  I apologize.  The payback of --

10   what happened here is that the defendant pays Herminio

11   Rodriguez and Margarita Rodriguez interest based on their

12   investments which they made quite a substantial amount.

13   During this time the Rodriguezes are actually in the

14   presence of the defendant.  He is writing them a check for

15   interest payments.

16        Another victim in this case by name of Angel

17   Rodriguez is actually present for this as well.  He is

18   under the understanding based on the defendant telling him

19   this, that that money is payoff for that particular

20   investment that they made.  So more or less that's the

21   profit that the Rodriguezes has made from their

22   investment.

23              THE COURT:  You mean investment on the Reaves

24   Road?

25              THE WITNESS:  I'm sorry?

```
 1              THE COURT:  On the Reaves Road project.

 2              THE WITNESS:  No -- well, yes, ma'am.  Yes,

 3   ma'am.

 4   BY MR. IRICK:

 5   Q    Now, let's just talk about that general for a second.

 6   As to the Reaves Road project, did that project ever

 7   result in any funds, any profit?

 8   A    It did not.

 9   Q    Okay.  As to the restaurant as well, from the review

10   of bank records, did the restaurant ever generate any

11   profit or revenue?

12   A    No, did it not.

13              MR. IRICK:  If Your Honor -- with your approval

14   go down to the Jose Melendez now.  I believe that's also

15   in dispute.

16   BY MR. IRICK:

17   Q    Let's talk about the first three entries there for

18   Jose Melendez, 2300, 75,000 and 2400.  According to Jose

19   Melendez, under what belief did he make those investments?

20   A    Again, he is under the same belief as the Rodriguezes

21   which we have explained before.  He is under the belief

22   that he was investing in a condominium project on that

23   land on Reaves Road in Kissimmee.

24   Q    As to the $75,000 flex line you see there, it's

25   account number ending in 5970.  What are the circumstances
```

1    surrounding that?

2    A    Again, this is very -- it's similar to the $75,000

3    flex line acquired fraudulently in the name of Herminio

4    Rodriguez.  Jose Melendez, we have reached him, he denies

5    having knowledge of this flex line.  He -- we showed him

6    the documentation.  He said, I did not sign for that flex

7    line.  So he had no knowledge this was taken out until

8    after the fact when he ran his credit and discovered that

9    he had this on his credit report.

10   Q    And, again, how did the defendant obtain Jose

11   Melendez's personal identifying information?

12   A    Again, Jose Melendez gave a very similar account as

13   the Rodriguezes did.  He was a what the defendant called a

14   qualified investor.  He invested money, and because of

15   this the defendant wanted his personal information, copies

16   of his social security card, copy of his driver's license,

17   copies of tax returns and things of that nature so the

18   defendant could show to a bank that he has investors in

19   his land project so the defendant could then take out by

20   himself loans for that property or any other type of

21   investment, not to be used for using their identity to

22   open an account in their name.

23   Q    Take a look at the Mellon Holdings Corporation parens

24   Jose Melendez entry.  What is that?

25   A    That's a company controlled by Jose Melendez.  That's

1   an additional $75,000 that Dr. Melendez invested into the

2   land project.

3   Q    All right.  Now, if we go down to the Cendana

4   entries.  I believe these are also in dispute.  What can

5   you tell us about the circumstances surrounding each one

6   of those home equity lines of credit or HELOC?

7   A    Ranier Cendana and Rogelio Cendana are brothers of

8   the defendant.  Both Ranier and Rogelio, we have spoken to

9   them, interviewed them.  Their accounts are this:  They

10  were approached by the defendant, their brother, to use

11  their names to acquire the initial mortgages on these

12  properties.  According to Ranier and Rogelio the defendant

13  asked him to put their names on the property because his

14  name was on many other properties and he was worried about

15  his own particular credit.

16       So he asked them if they would just put their names

17  on the property.  All they had to do was sign the mortgage

18  documents and closing documents.  Their names will be on

19  it, but that's all it would entail.  Payments, anything to

20  that nature would be up to the defendant.

21       What eventually happens with this HELOCs, these

22  HELOCs that you see before you, unbeknownst to Ranier,

23  Rogelio Cendana and their wives, which you can see their

24  names, Janice and Nicole, their information was then used

25  to acquire additional funding, these home equity lines of

```
 1    credit.
 2         We have showed these documents to these victims as
 3    well.  They have all denied signing the HELOC agreements.
 4         They all do admit to signing the initial mortgages
 5    which was basically just putting their names on the
 6    mortgage.  They had no knowledge when this was going on
 7    that he HELOCs were then taken out on the property and
 8    that their identities were used without their permission.
 9    Q    Now, the initial mortgages, those were just
10    traditional purchase mortgages, correct?
11    A    That is correct.
12    Q    And they did obligate themselves on those mortgages,
13    correct?
14    A    They did.
15    Q    And those --
16              THE COURT:  Counsel, $800,000 mortgage?
17              MR. IRICK:  No, Your Honor.
18              THE COURT:  It's a different mortgage?
19              MR. IRICK:  These are different mortgages.
20    BY MR. IRICK:
21    Q    Those are not scored as loss, correct?
22    A    That is correct.
23         These are -- the victims here Ranier and Rogelio
24    Cendana and their wife's -- well, basically Ranier and
25    Rogelio, the brothers basically at the defendant's request
```

1    just gave them their information to be put on as the

2    owners of the -- these homes that are being purchased.  So

3    therefore, basically, their names are on the mortgage,

4    they sign the closing documents, but after that, all

5    responsibility was supposed to be given to the defendant.

6              THE COURT:  These are properties other than the

7    Reaves Road property?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Okay.

10   BY MR. IRICK:

11   Q    Now, are you familiar with some powers of attorney

12   that have been submitted by the defense in relation to

13   their sentencing memorandum?

14   A    I am.

15   Q    And what relation are those powers of attorney to

16   either the original mortgage or the HELOCs, if you can

17   explain.

18   A    The powers of attorney that I have had a chance to

19   review clearly resemble ones that would be used during a

20   closing of a mortgage for residences.  So therefore,

21   basically they are signed for at the closing.  The victims

22   in this case, Ranier and Rogelio Cendana, they're signing

23   these powers of attorney so that their brother, the

24   defendant, could then basically manage the property after

25   the fact and do any dealings in terms of, you know, just

1    basic stuff with the residence.  They had no understanding

2    or belief that their identification would be used after

3    the fact, after the initial mortgages to then acquire home

4    equity lines of credit.

5    Q    In fact, are those powers of attorney actually signed

6    and dated the same day as the original mortgage closings?

7    A    They are.

8         THE COURT:  So I understand this, they got the

9    mortgages the same day as the power of attorney and then

10   later the home equity line of credit on that property was

11   taken out?

12        THE WITNESS:  Yes, ma'am.

13   BY MR. IRICK:

14   Q    And do those powers of attorney also say on there

15   they were being completed in relation to the acquisition

16   of title insurance?

17   A    Yes.  Yes, it did.

18   Q    We have already discussed the $800,000 as to Regions

19   Bank.

20        Let's go to Angel Rodriguez's investments here.

21   There are two line items there.  One for 4850.20, and one

22   for $205,614.21.

23        Have you spoken to Angel Rodriguez?  And if so, what

24   did he tell about these investments?

25   A    We have.  This -- the $205,000 that you see here

1    before you came from his 401K.  He was investing again in

2    a land project condominium project by the defendant.  He

3    spent, as you can see here, quite substantial amount of

4    money to the defendant or gave to the defendant as an

5    investment in this project.

6    Q    What about as to Mario Granado.  There's a 60,000

7    total there.

8    A    Again, here's another investor that the defendant

9    approached asking for funds to support his land

10   development project, the condominium project on Reaves

11   Road again.

12   Q    How about George Seckinger, 20,000 is listed here.

13   A    Again, that is a similar account.  He was approached

14   by the defendant to provide funds for his land development

15   project off Reaves Road.

16   Q    Now, through your review of the bank records and

17   particularly the bank accounts where all this money went

18   into, what was this money used for?

19   A    Money was used for different things.  One to be paid

20   to old investors so as more investors are coming in,

21   payments are then going out to old investors.  All monies

22   then paid to -- for payroll.  He had employees at each one

23   of his companies that he ran, Cameo Palms Development,

24   Cameo Mortgage group, Cameo Investment Group, 1st Class

25   Title.  And then there's also payments that come out as

1  you can see for his own personal mortgage, his own

2  personal credit cards, and a variety of other different

3  expenses.

4  Q    Now, you discussed there that some money was money of

5  later investors was used to pay early investors.  Did you

6  interview someone named Brent Dela Cruz?

7  A    I did.

8  Q    Who is this and what did he tell you as to that

9  issue?

10  A    Brent Dela Cruz was an employee for the defendant.

11  He basically -- his job entailed doing mostly financial

12  stuff, basically payroll, writing checks based off the

13  accounts that were operated by the defendant, interest

14  payments checks and things look that to investors.

15      What he told us was is that first of all the

16  defendant -- he would have to go to the defendant every

17  time he had to write a check to get his approval.  So

18  Brent Dela Cruz actually managed the books, if you will,

19  but he had go to the defendant to actually say, I need --

20  this check needs to be written for this purpose, and then

21  the defendant would approve that.

22      Brent Dela Cruz also said that money would be paid so

23  if somebody came in to make an investment on the Reaves

24  Road property for whatever denomination or amount, money

25  would be taken from that to pay off an older investor for

1  the same investment, if you will, the Reaves Road

2  property.

3  Q     That's because no money had been generated through

4  the defendant's projects, correct?

5  A     That's correct.

6  Q     What also did Brent Dela Cruz tell you about

7  signatures on loan applications -- excuse me -- on loan

8  applications and quitclaim deeds, mortgage notes.  What

9  did he tell you regarding that?

10 A     Brent Dela Cruz would -- on occasion he would either

11 notarize some of these quitclaim deeds or loan documents

12 or sometimes he would sign as a witness.  He said that on

13 multiple occasions he would be approached by the

14 defendant, his boss, to notarize or sign as a witness

15 without all parties being present.  So, if you will, if

16 there was a quitclaim deed from a victim in this case to

17 the defendant, the victim in this case would not be

18 present, Brent Dela Cruz was asked to still sign that

19 document.  And according to Brent Dela Cruz on occasion

20 the defendant would say I have a power of attorney for

21 that particular person and Brent Dela Cruz would just go

22 ahead and he would notarize or sign as a witness.

23           MR. IRICK:  Your Honor, I have nothing further

24 at this time.

25           THE COURT:  All right.  Cross?

```
 1                      CROSS-EXAMINATION

 2              MR. DUROUGH:  Yes, Your Honor.

 3     BY MR. DUROUGH:

 4     Q    You have seen the documents that we filed with the

 5     Court.  You talked about powers of attorney?

 6     A    I have yes, sir.

 7     Q    Now, let's talk about Ranier and Rogelio Cendana

 8     first.

 9     A    Okay.

10     Q    They -- basically they invested no money, correct?

11     A    I cannot recall if they invested money in any of his

12     projects.  I'm trying to --

13     Q    Well, particularly these projects, these townhomes

14     here that we're talking about with the HELOCs on, they

15     didn't invest any money in it?

16     A    Not to my knowledge, but I can't answer either way.

17     Q    So then they took title to the property and they made

18     clear to you they understood that Ramon Cendana was going

19     to pay the mortgage?

20     A    That's correct.

21     Q    Now you have talked about the power of attorneys and

22     given your interpretation of those powers of attorneys,

23     that these were strictly for closing documents.

24     A    That's what they appear to be, yes, sir.

25     Q    Is that your opinion also on the durable power of
```

1   attorney that we have filed with the court signed by

2   Ranier Cendana?

3   A    It is.

4   Q    Where it says that he has -- that Ramon Cendana has

5   the right to encumber the property?

6   A    Can you explain what you mean by encumber?  I

7   apologize.

8   Q    Take a loan out on it.

9   A    Take a mortgage loan out, yes.  A mortgage loan, yes,

10  sir.

11  Q    Yes.  And it doesn't have any time limit or anything

12  like that on it, does it?

13  A    I don't believe it does.

14  Q    Okay.  Now, you have talked about Ranier Cendana

15  didn't know what was going on.  Where did Ranier Cendana

16  work?

17  A    He worked for his brother.  However, he had his own

18  job where he lived up in the northeast.  He assisted his

19  brother with his company.  Occasionally he would fly down

20  to help him out at the defendant's request.

21  Q    Okay.  And he was compensated and Ranier Cendana had

22  access to the books and everything in the company, didn't

23  he?

24  A    That's what I understand, yes, sir.

25  Q    Okay.  So Ranier Cendana felt he was defrauded or

1    somehow cheated on these HELOCs, he would have seen it

2    when he came down and was doing work for his brother,

3    handling the books of the company, wouldn't he?

4    A    I do not agree with that.  That would require

5    everything to be written down in the books and I'm not

6    quite sure that that was written down in the books.

7    Q    Now, you have also -- we have talked about Jose

8    Melendez or you discussed it a lot.  Who told you that

9    Jose Melendez was just investing in the Reaves Road

10   project?

11   A    He told us that he invested in the Reaves Road

12   project.

13   Q    And he thought he was in that and you saw that the

14   documents which showed he was a managing member of the

15   Cameo Investment Group and the Cameo Palm Development

16   Group?

17   A    What document are you referring to, sir?  He was the

18   managing member.

19   Q    The documents that were filed that you say you saw

20   that powers of attorney.  Did you see the documents which

21   showed that he was also registered as a managing member in

22   those corporations?

23   A    Are you referring to the Sun Biz documents articles

24   of incorporation.

25   Q    Yes.

1    A    I have seen those, yes, sir.

2    Q    Okay.  And did he any time tell you he was also

3    involved in the restaurant investment?

4    A    I do not recall him saying that he invested

5    specifically in the restaurant itself.

6    Q    Okay.  But he was aware that money was going into the

7    restaurant?

8    A    I'm not sure.  No, sir.

9    Q    And Mr. Rodriguez, again, told you that he was

10   investing in the land development?

11   A    That's correct.

12   Q    And when -- did you ever speak to the owner of the

13   land?

14   A    Pedro Gonzalez.

15   Q    Yes.

16   A    Yes, we did.

17   Q    Did Pedro Gonzalez ever tell you how much money he

18   received totally?

19   A    He wasn't sure how much exactly he received.  He did

20   200,000 on the existing mortgage on the property was paid

21   off and that was the only thing he could say for certain

22   the exact amount that he received.  But he did say he

23   received interest payments.  He could not be sure on

24   exactly how much, though.

25   Q    Did you ever talk to anyone when you were talking

1   about this nothing took place on this land development.

2   You said something less than $50,000 was spent.  Did you

3   ever talk to anyone else to determine if anything else was

4   done, if there was an attempt to try to continue the land

5   development?

6   A    The 50,000 is based off the bank documents, less than

7   50,000.  We had talked to other people involved in his

8   companies and they had discussed certain issues that were

9   done like surveying the property, getting architectural

10  renderings, doing marketing materials, but beyond that,

11  nobody has said that anything else was done.

12  Q    Now, as far as you have talked about all these

13  investments, in your going through the additional

14  investments that were taking place, there were townhomes

15  that were purchased, correct?

16  A    It is my understanding, yes.

17  Q    All right.  And there was also the restaurant

18  investment.

19  A    Yes.

20  Q    Do you recall how much money when you went through

21  all these books went into the restaurant investment?

22  A    It would -- I would have to look at the actual

23  accounts.

24  Q    Would you agree it was several hundreds of thousands

25  of dollars?

```
1   A     I can't say exactly how much, sir.

2   Q     And that restaurant was actually opened?

3   A     It was.  Yes, sir.

4   Q     And opened for a period of time and then failed

5   because it couldn't make a profit?

6   A     It did.  It was open for I think less than a year.

7   Q     But it wasn't like you just never opened, no money

8   was spent on it or anything else?

9   A     No.  Money was spent on it.

10          MR. DOROUGH:  I don't have any further questions

11  of this witness, Your Honor.

12          THE COURT:  Mr. Irick, anything further?

13          MR. IRICK:  Nothing, Your Honor.

14          THE COURT:  All right.  So referring to

15  Government's Exhibit 2, it is your testimony that the

16  individuals and corporations that are listed in here have

17  advised you through your investigation that they are

18  victims and this is the amount of their loss?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  All right.  You may take your seat.

21          MR. DOROUGH:  Your Honor, I'd like to have

22  Mr. Cendana step back to address certain ones of these

23  issues.

24          THE COURT:  All right.

25                    (Defendant sworn)
```

```
 1            THE DEFENDANT:  Yes, ma'am.
 2                     DIRECT EXAMINATION
 3  BY MR. DOROUGH:
 4  Q    Now, I'm going to ask you some questions here
 5  concerning this sheet.
 6       The Government has put in --
 7            THE COURT:  Are you back on Exhibit No. 2?
 8            MR. DOROUGH:  Exhibit No. 2 Your Honor.
 9  BY MR. DOROUGH:
10  Q    Let's talk about -- first, let's talk about your
11  brother Ranier Cendana and his wife Janice Cendana.  How
12  did they get involved in investments in this company?
13  A    My brother Ranier Cendana was hired as COO of the
14  company.  I would say sometime in 2006 his job was to
15  manage the operation of the company or the companies, if
16  you will.
17  Q    How many companies were there?
18  A    We had the Academy Mortgage Group, then we had this
19  Cameo Investment Group, the Cameo Palms Development, and
20  they were created because of 110-acre limit being that we
21  needed some investment funds to purchase the property or
22  give money to Dr. Pedro Gonzalez to secure the property at
23  that point because we felt that the property that he was
24  selling was worth a lot more than what he was selling it
25  for.  And then we had basically an equity already from
```

1    that point.

2        Dr. Gonzalez is a family friend of ours because my

3    aunt, who's in this court, used to work for him and I used

4    to go to gatherings at his --

5    Q    Well, let me ask you this particularly.  Let's go

6    back here to Ranier Cendana.  Was he aware of the

7    operations of the company?

8    A    Yes.

9    Q    We have these HELOCs on Ranier and Janice Cendana.

10   Did you get powers of attorney from them?

11   A    Yes.

12   Q    Those power of attorneys would allow you to encumber

13   these pieces of property?

14   A    Yes.

15   Q    Now, was Ranier aware that you had put these HELOCs

16   on the property?

17   A    Yes.

18   Q    What was this money used for?

19   A    Pay mortgages on that property.

20   Q    And these properties were not free and clear?

21   A    No.

22   Q    Was this information available from the books in that

23   Ranier had access to?

24   A    Yes.

25   Q    And Rogelio and Nicole Cendana, did any one of them

1  know about the HELOC you had taken out and their property?

2  A    Yes.

3  Q    And did you advise them of that?

4  A    Yes.

5  Q    And what did you use the money for?

6  A    Mortgages.

7  Q    Now, we also have this Mellon Holdings Corporation,

8  Jose Melendez which is a $75,000 check that he gave to

9  your companies, correct?

10  A    Correct.

11  Q    Was that for the land development?

12  A    For -- it's dated on 2006 that was for the land

13  development, supposedly the five acres that we're looking

14  at.  However, that failed and we switched it over to the

15  110 acres.  The other 75,000 that was dated on August of

16  2008 which is 75,000 on Jose Melendez, that went to the

17  restaurant because I needed help for the restaurant.

18  Q    Now, were these people that -- like Jose Melendez,

19  was he placed as members of several of these corporations?

20  A    Yes.  At that time we had many discussions about the

21  security of -- our security as a group of this property

22  and to have leverage on this property.  There was a one

23  point we didn't have any leverage because it was only a

24  land contract, Your Honor, on this property.  And there

25  was a point that we were having a problem giving Dr. Pedro

1    Gonzalez additional lump sum of money that he wanted, you

2    know, on this purchase of the property.  We were

3    continuing to pay him in a monthly interest, very low

4    monthly interest on it.  And then there was a point always

5    asking for 10,000 here 20,000 there.  And at that point we

6    needed some funds.  At the same time we needed leverage on

7    that property.  And I say that because there was a point

8    that we couldn't pay it any more but Pedro Gonzalez says,

9    well, you know, Ray, if you guys can't come up with any

10   more money, then there's no deal here.  I'm going to walk

11   away, and I'm going to keep this land.

12       At that point we will lose all that monies that been

13   given to him.  So we decided to let's go ahead and pay him

14   more money and then see if we can go ahead and get a

15   refinance on this land contract.

16       My brother headed that work on that refinance.  My

17   brother Ranier.  He dealt with Regions Bank first with

18   Erica Sanchez, then he was referred to a Shelia.  I forgot

19   the last name now.

20   Q   Okay.  Well, what I want to talk to you, though, is

21   Dr. Melendez also was involved in the restaurant.

22   A   Yes.

23   Q   These other monies that we have been talking about,

24   for example, Angel Rodriguez.  Was this an investment in

25   the land or --

1   A    No.  This was a promissory note to Mr. Rodriguez

2   based on the information -- all the information that I

3   could -- that I can provide to him so he can have this

4   security of where that money is going and what's going to

5   happen with that money at the end.

6        A lot of these clients, Your Honor, are friends and

7   families.  They're connected one way to another with

8   everyone.  Angel Rodriguez came from Chicago who was

9   referred to me by Roberta Rodriguez who is a very good

10  friend of mine who was a part of this group in doing due

11  diligence.  And also he knows Herminio Rodriguez.  He

12  knows Thomas Jones who is also one of the investors.

13  Everyone knows each other in this group.

14       Well, of course they talk among themselves too before

15  they make any type of investment.  So how's Ray, how's he

16  paying.  How's, you know, is everything cool.  You know,

17  how is the land, how is this.  And you know, based on

18  those conversations, and based on what I presented, you

19  know, I leave it up to them either make an investment or

20  not, Your Honor.  I actually made more -- I made interest

21  payments on a portion of this deal to Mr. Rodriguez --

22  Angel Rodriguez as far as interest payment until I'll say

23  February of this year, and then I just couldn't do it any

24  more.

25       But however there was a decline on those payments.

```
 1   We started with something like $2,000.  I don't have the
 2   books, Your Honor, so I don't know.  And then we declined
 3   on those payments because of the market because of all the
 4   other expenses I was incurring, you know, with the
 5   companies and the projects and everything else.
 6        So but I continued to pay them because it was my
 7   obligation.  However, at this point it stopped and of
 8   course now he feels I defrauded him.  I didn't stop
 9   paying.  I told them and we had conversations and meetings
10   and I said right now I can't afford to pay you.
11   Q    Let's get back here to these numbers right now.
12        All right.  Number of these investments you gave
13   promissory notes back?
14   A    Yes.  They been renewed and some of them are paid
15   off.
16   Q    Let's talk for just a moment before I get up to the
17   Rodriguezes, Mario Granado.
18   A    Mario Granado was my neighbor at Southern Charmhouse.
19   This was in 2003.
20   Q    I need to ask you first, though.  Let me ask you a
21   question here.  Mario Granado, was he investing in the
22   land or the restaurant?
23   A    No, he wasn't actually investing on the land.  Mario
24   Granado invested money because the presentation I made to
25   him was that I was lending out some money to some other
```

1    neighbors who was paying me back some interest.  In turn I

2    needed some of those funds to fund other people that

3    needed some help.  If I didn't have it I would find

4    someone else to help me.  We started with that.  We

5    started something with like $10,000.  At that time it was

6    paid off.  And he says, hey, can I renew this?  I said

7    sure.  So we kept on going with that until today.  At the

8    end, however, I needed some help for the restaurant and he

9    knew the restaurant.  He used to come to the restaurant

10   all the time.  And we would talk about the restaurant,

11   how's it going.  But I continued to pay his interest on

12   the money that I owed him.  And I used that money towards

13   the restaurant, Your Honor.

14   Q    How much was actually invested in the restaurant?

15   A    Um, I'd say about $60,000 I would say at that point.

16   I don't know if I should call it an investment.

17   Q    Whatever, but at this point -- but total how much

18   money was put into the restaurant?

19   A    Oh, we spent close to a million dollars on that

20   restaurant.

21   Q    And the restaurant did open?

22   A    It did open.  We signed a lease in August of 2006 for

23   two years.  It was under renovation which we continued to

24   pay the monthly rental of 4500.  Then on August of 2008 we

25   finally opened the restaurant.  And it failed a year

1    later, which I put in another loss of approximately close

2    to another 200,000 of a loss because it was upside down

3    from the get-go.

4    Q    Now, I want to talk particularly now for a moment

5    about Herminio Rodriguez on the flex line.  You did sign

6    the flex line?

7    A    Yes, I did.

8    Q    Okay.  Did you -- did Herminio Rodriguez know about

9    it?

10   A    Yes, he did.

11   Q    How did he know about it?

12   A    Well, when the flex line came along -- because one

13   time Miss Erica Sanchez came over to the office, she was

14   with Regions Bank.  She said, hey, Ray, we're giving out

15   this loan, you know, you can do flex lines to your

16   company things like that. I know you're doing a project.

17   So, you know, this way you can use the bank's flex line,

18   and I said okay.

19        Now, we have an LLC.  I don't want anyone or any of

20   my group to be liable just in case something happens on

21   this flex line.  She says, no, it's under LLC, but, yes,

22   we have to put members under LLC.  I said, okay, that's

23   fine.  So after that I spoke to the group and I said to

24   them, hey, look we have to leverage and have more

25   expenses.

1  Q    Now, when you say you spoke to the group, did that

2  involve Herminio and Margarita Rodriguez?

3  A    Yes.  Right.  And who was involved in this group are

4  Dr. Melendez.  We have Herminio and Margarita -- well,

5  mostly Herminio.  Margarita was not really talked to.

6  It's Herminio, the husband, we talked to a lot.  We have

7  Roberta.  We have Ranier.  Then we have Jesus.  This is

8  the actual group of people that always met a lot in terms

9  of the businesses and the development of this 110 acres.

10 Q    And were they also aware of the credit cards that

11 were taken out?

12 A    Yes.  Again, this is all part of a LLC, and what I

13 told these people and this, and which they agreed on, is

14 that if you don't have to put any more cash into this and

15 if we can get credit off of it, then let's go and do it if

16 that's okay with you all.  And they said that's fine.  As

17 long as we don't have to put any more cash into it, let's

18 do it.

19      And, again, you know, when we started the flex lines

20 and the lines of credit with Bank of America, I know that

21 there wasn't being reported in their credit reports

22 because I was told it was never going to be reported in

23 their credit reports, you know, by the bank reps because

24 this is a LLC.  You know, this is a company.  This goes

25 through the D&B, the Dunn and Bradstreet, instead of an

```
 1   individual account.  So I said, okay, that's fine.
 2        Now, there was actually a time --
 3   Q    No, no.  I want to get through this first because
 4   we're going to discuss some of the other issues later.
 5        And there was some discussions about how the money
 6   was spent here, payroll for the companies and interest
 7   payments.  Were there other thoughts?
 8   A    The initial large amounts of investments that they
 9   made by the main managing members went to the head, Pedro
10   Gonzalez.  Like I said, he was paid lump sums of money
11   plus interest.
12        Your Honor, we have an unorthodox accounting practice
13   in that -- in our company.  It goes either to CPD which is
14   Cameo Palms or Cameo Investment Group and, you know, the
15   CPA knows that, you know, and Ranier and Brent knows that
16   and that's the way they were moving things around.
17            MR. DOROUGH:  Now, Your Honor, right now I'm not
18   going to ask him any more questions about this.  He wants
19   to address the Court later and there's some information in
20   that.
21            THE COURT:  All right.  Mr. Irick.
22            MR. IRICK:  Yes, Your Honor.
23        Shall I cross from here?
24            THE COURT:  Yes.
25                    CROSS-EXAMINATION
```

1   BY MR. IRICK:

2   Q    First you talked this morning about the powers of

3   attorney related to Ranier and Rogelio and those three

4   HELOCs.  Those power of attorneys were executed as part

5   the closing documents on the original mortgages, correct?

6   A    Yes.

7   Q    Okay.  And now, you said that those power of

8   attorneys allowed to you encumber the property, correct?

9   A    Yes.

10  Q    That's not actually true, is it?  That's only true as

11  to Ranier, it's not true as to Rogelio, is that right?

12  A    There was one power of attorney only with Rogelio,

13  that's correct.

14  Q    With Rogelio the power of attorney was limited to one

15  month, correct?

16  A    That's correct, for the purchase of property, yes.

17  Q    And the HELOCs you obtained were outside that month,

18  correct?

19  A    That's correct.

20  Q    But as to all those power of attorneys they were

21  executed with the closing documents, right?  For the

22  original loan.

23  A    Yes.

24  Q    Now you talked some about you having to pay

25  Dr. Gonzalez additional lump sum monies because he may

1    walk a way from the deal, right.

2    A    Right.

3    Q    Wasn't it true that you had him quitclaim the deed to

4    that property to yourself and your companies?

5    A    Are you talking about at the -- okay.  There was a

6    point that we had to quitclaim, which, us the company into

7    that?  Into -- or Dr. Gonzalez after the closing?

8    Q    I'm asking you, sir, what did you do.

9    A    Okay.  What we did was we put quitclaim Dr. Gonzalez

10   after the closing because we still owed him some money on

11   the property, and for a good moral reasons for me I wanted

12   to make sure that, you know, that he's not lost any of his

13   interest on that property.

14   Q    So you quitclaim the deed to yourself for good moral

15   reasons so he doesn't lose any money, is that what you're

16   saying?

17   A    That's correct.  No, no, not to Dr. Gonzalez.  From

18   after the closing was done.

19   Q    Did you or did you not quitclaim the deed from

20   Dr. Gonzalez and his wife to yourself, your companies and

21   Dr. Gonzalez?

22   A    Before the close or after the closing?

23   Q    Did you ever do that?

24   A    I don't remember -- if I -- if we did -- if we added

25   the company to -- to secure or interest, we probably did

1    with this, you know, with him knowing, Dr. Gonzalez

2    knowing because he knows that we have paid him a lot of

3    lump sum of money.

4    Q    So once the property was quitclaimed over to yourself

5    and companies, you couldn't walk away?

6    A    Well --

7    Q    Correct?

8    A    It was, you know, we were added upon with him, you

9    know, at a point and that was I think just myself or the

10   company, I don't remember.  Again, I don't remember which

11   one was --

12           MR. IRICK:  Your Honor, may I approach?

13           THE COURT:  Yes.

14   BY MR. IRICK:

15   Q    I have marked for identification as Government's

16   Exhibit No. 3.

17        Do you see that the quitclaim deed is May 11, 2007?

18   A    Yes.

19   Q    Okay.  From Dr. Gonzalez and his wife to yourself,

20   one of your companies, and Dr. Gonzalez?

21   A    Yes.

22   Q    So at this point in May 2007 you owned the property,

23   correct?

24   A    Partly owned the property with Dr. --

25   Q    Okay.  Now, you talked a lot about interest payments

1    that you made to other investors in this case.  What

2    monies was used to pay those interest payments?

3    A    Different monies from, you know, our revenue from

4    either Cameo Mortgage, 1st Class, some, you know, family

5    members.  That's not a part of the investment but solely

6    just to help me out and is giving me money also.

7    Q    So you're saying that the investors were paid from

8    the funds the revenues generated by Cameo Mortgage Group

9    and 1st Class Title?

10   A    Some of the revenues from Cameo Mortgage, 1st Class

11   and also personal funding, personal monies from myself, my

12   wife, and also family members, yes.

13   Q    Now, these investors didn't invest in Cameo Mortgage

14   Group or 1st Class Title, did they?

15   A    No.  You're asking me how did I pay those interest

16   payments to them.

17   Q    Correct.

18   A    Right.

19   Q    So, I'm asking you did they invest in Cameo Mortgage

20   Group or 1st Class Title?

21   A    No, they didn't.

22   Q    Okay.  So did the properties or the projects that

23   they invested in ever generate any revenue?

24   A    No, it didn't.  It hasn't yet because we were still

25   working on that.

1   Q    Now you said that Herminio Rodriguez, Margarita

2   Rodriguez and Jose Melendez knew that you were applying

3   for credit cards and flex lines of credit in their names,

4   is that correct?

5   A    Yes, they knew that I was applying for credit so they

6   don't have to put up any more money as far as cash

7   infusion.

8   Q    Did they know that you were using their personal

9   identification obligating them on those lines of credit?

10  A    No.

11  Q    Okay.  And you actually signed their names on those

12  applications, correct?

13  A    Yes, as part of the -- as a managing member and

14  members of Cameo Investment Group I did that, yes.  Cameo

15  Investment Group.

16  Q    You personally obligated them on loans.

17  A    Well --

18  Q    Correct?

19  A    I wasn't explained that way with Regions Bank.

20  Q    You made an application, didn't you?

21  A    Yes, I did.

22  Q    And on those applications put their name, social

23  security number, date of birth, personal information?

24  A    Yes.

25  Q    Okay.  When you made those applications you didn't

1   present to the bank any profit and loss statements or

2   corporate documents related to your company, did you?

3   A    That's -- I don't remember what other parts of the

4   application was brought into Erica Sanchez.

5   Q    So you knew you were obligating them personally.

6   A    No.  No.

7   Q    Is it your testimony you didn't know that they were

8   going to be obligating -- you applied in their name.

9   A    I was asked by Erica Sanchez to put a member's name

10  underneath Cameo Investment Group.

11  Q    All right.  Let's talk about Erica Sanchez since you

12  brought it up.  Erica Sanchez, whenever you went to

13  Regions Bank you dealt with her, correct?

14  A    Her and two other sorts --

15  Q    Okay.  Before she left you dealt with her, didn't

16  you?

17  A    Yes.

18  Q    Now, isn't it true that you paid her money?

19  A    Paid her money?  I didn't pay her.

20  Q    You paid her money separate from anything related to

21  these loans?

22  A    No.  That's not true.

23  Q    So it's your testimony you never paid her any money?

24  A    No.  She borrowed money.  She borrowed a thousand

25  dollars from me.  She never paid it back because she was

```
 1   trying to help her father.  There was a case about her

 2   father that she needed money.  So she asked me if she

 3   could loan a thousand dollars.

 4   Q    Okay.  So you're saying there's a loan of a thousand

 5   dollars payment you made to her as a loan?

 6   A    It wasn't a payment, sir.  You know --

 7   Q    Let me ask you this:  Did you ever write her a check

 8   for a thousand dollars?

 9   A    I don't remember if it was a check or cash.  It my

10   have been a check.  Again, I don't remember.

11   Q    Okay.  And what if I was to tell you that she told us

12   that you gave her that money, you know, to help her and

13   you called it a marketing expense, and you gave her that

14   money to her to help her with her own companies that she

15   was going to be involved with you?

16   A    Not true.

17   Q    That's not true?  So she's lying to us?

18   A    Yes.

19   Q    Okay.  Is it your testimony that Jose Melendez knew

20   that he was investing in a restaurant project?

21   A    That was a borrowed money.  That wasn't more like an

22   investment.  It was borrowed money.  He knew I was having

23   a tough time with the restaurant.  We needed help with the

24   restaurant.  He knew that probably with the restaurant

25   that's going to help the rest of the projects based on
```

1   projections that he, you know, that's been given to him

2   before what the restaurant can do as a company.

3       So at one point I told him, look, I need to borrow

4   money, Dr. Melendez.  You know, he knows me.  He knows my

5   family.  He's been at my home.  We have been, you know,

6   back and forth.  And I said I need to borrow $75,000.  So

7   whatever you can lend me.  And then he said, well, the

8   only thing I can lend you money is through some type of a,

9   I guess, a money market that he has through a financial

10  advisor.  And he says -- and then I told him that, you

11  know, what can I pay you as far as interest on that money,

12  on that 75.  Well, you know, just something very small and

13  very normal.  I said, okay, that's fine.  Let's draw up

14  the promissory note.  And so I sent it to him and he

15  e-mailed to him and it went through his financial advisor.

16  His financial advisor looked at it and it was fine with

17  him and then they wired that money.

18  Q    Mr. Cendana, isn't it true that you asked Jose

19  Melendez to back the restaurant company and he said no?

20  A    I didn't ask him to invest in that restaurant.  I

21  wanted to borrow money and I said I would give you -- I

22  would give you -- put you as a managing member as a small,

23  you know, as a small percentage owner of this restaurant.

24  He says, no, no, you don't have to as long as you pay me

25  back.

```
 1    Q    Let me ask you this.  You made some reference to --
 2    that some persons were put on corporate documents as
 3    managing members of some of your companies.  Right?  Is it
 4    your testimony that those people knew that you put them as
 5    managing members?
 6    A    Yes.  Yes.
 7    Q    Okay.  You actually filed those documents, didn't
 8    you, to put them as managing members?
 9    A    Yes, we did.
10    Q    It was your direction, correct?
11    A    Yes, I did.
12    Q    None of these people ever signed any documents
13    acknowledging they were managing members, that they knew
14    they were being placed as a managing member?
15    A    Yes, they knew they were being placed as managing
16    members.
17    Q    None of them ever signed anything related to that,
18    did they?
19    A    No.
20         MR. IRICK:  Nothing further at this time, Your
21    Honor.
22         THE COURT:  All right.  Anything further from
23    the defendant?
24         MR. DOROUGH:  No, Your Honor, not on those
25    issues.
```

```
 1            THE COURT:  All right.  Do you have any

 2   additional evidence on the amount of loss?

 3            MR. DOROUGH:  No, Your Honor.

 4            THE COURT:  Anything further from the

 5   government?

 6            MR. IRICK:  No, Your Honor.

 7            THE COURT:  All right.  I find that the

 8   government has proven beyond a reasonable doubt -- not

 9   beyond a reasonable doubt but by a preponderance of the

10   evidence that the amount of the loss is in excess of one

11   million six hundred -- seven hundred thousand dollars.

12   Specifically the Court adopts the Government Exhibit No. 2

13   with the adjustment on the amount of loss to Regions Bank

14   as the Court had discussed before.  It's $604,238.36

15   rather than the 800,000.

16       Let's go on to your 10 or more victims.

17            MR. DOROUGH:  Well, Your Honor, that would -- at

18   that point the ten or more victims is based on if you --

19   they have listed -- if you're finding all the victims they

20   have listed for the 1.9 million is 1.6, then we have one,

21   two, three, four, five, six -- I don't know how -- seven,

22   eight, nine, 10, 11, -- there would be 11 or 12 on this,

23   but I would submit to the Court that since Margarita

24   Rodriguez and the Masero (phonetic) Financial are one in

25   the same and Jose Melendez and the Melon Holdings are one
```

1    in the same, that there -- I do not believe then there

2    would be 10 victims of this because you're accepting all

3    the other numbers.

4            THE COURT:  Well, I have 13.  Angelica

5    Macatangay, Raul Macatangay, Herminio Rodriguez, Margarita

6    Rodriguez, Jose Melendez, Regions Bank, Ranier Cendana,

7    Janice Cendana, Rogelio Cendana, Nicole Cendana, Angel

8    Rodriguez, George Seckinger and Mario Granado.

9            MR. DOROUGH:  I understand.

10            THE COURT:  That's more than 10.

11       All right.  The other -- the next question is

12    sophisticated means.

13            MR. DOROUGH:  Your Honor, I think you've heard

14    everything that occurred in the situation.  The promissory

15    notes, the restaurants, the land development.  That is the

16    situation where the Court would have to make the

17    determination if they think it was done in a sophisticated

18    manner under the facts which you have now heard.

19            THE COURT:  All right.  I find that the

20    probation has properly scored two levels for sophisticated

21    means under the guidelines 2B1.1B9C.  The scheme certainly

22    involved sophisticated means.

23       The next question is paragraph 32, whether or not

24    there was more than one million dollars in gross receipts

25    from one or more financial institutions.

```
 1            MR. IRICK:  Your Honor, we will concede there
 2    was not based upon the finding of Regions Bank.  It puts
 3    it right under that level.
 4            THE COURT:  All right.  Did you have any
 5    objections to any of the others?
 6            MR. DOROUGH:  The only other one, Your Honor, in
 7    my presentence memorandum I said that was going to be left
 8    to the Court was the issue on Angelica and Raul was the
 9    issue of violation of trust.
10            THE COURT:  All right.  Well, I think that's
11    been more than proven by more than a preponderance of the
12    evidence, so I will --
13        Based upon defendant's testimony, I do have some
14    question about acceptance of responsibility.  The
15    defendant is required to accept responsibility for all
16    acts involving this offense, not just the offense conduct
17    with this count.  It seems to me that he may not be
18    accepting responsibility for the relevant conduct, but
19    I'll hear from the government on that.
20            MR. IRICK:  Your Honor, we would agree from --
21    based upon the cross-examination of the defendant today,
22    particularly the defendant's explanations of what he did,
23    of what the people knew, I believe misleads the Court.  At
24    certain points he did state on his direct examination
25    that, for example, Herminio Rodriguez and Dr. Melendez
```

1  knew that the names were being put on a -- these loans

2  that were taken out in their names.  Upon cross, he then

3  admitted that they actually didn't know.  So, Your Honor,

4  that's just one example.  I'd say that the defendant still

5  believes that what he did is not illegal.  To a certain

6  extent I think he's still contesting his investment was

7  not a scheme.

8      And, Your Honor, I'll note on this issue that all

9  these people that are sitting right here, the United

10  States has not asked to score these victims.  They have

11  scored those particular people listed in this chart of

12  victims and the defendant still cannot accept total

13  responsibility as to those persons.

14      Prior to coming in here, Your Honor, we believe that

15  acceptance was appropriate and the Court still may find

16  so, but based on the testimony today the United States

17  would have a serious question as to that.

18          THE COURT:  Is the government withdrawing the

19  additional level at paragraph 38?

20          MR. IRICK:  Your Honor, it's my understanding

21  that additional level is based upon the defendant's timely

22  plea of guilty in this case.  Unless -- unless the Court

23  would do another two points, I don't believe it would be

24  appropriate necessarily to withdraw that one point by

25  itself.  That's my understanding of the law.

1          THE COURT:  Counsel, would you like to be heard?

2          MR. DOROUGH:  Yes, Your Honor.  The acceptance,

3    when the plea was entered he freely accepted what he had

4    done with his cousins was totally wrong.  What occurred --

5          THE COURT:  That's not the issue.  The issue is

6    the relevant conduct.

7          MR. DOROUGH:  I understand, Your Honor.  And he

8    still feels strongly that many of these people were fully

9    aware what was going on, and knew how the money was used

10   and how it was being raised and how it was being

11   distributed.

12       He does have a statement I think that he should read

13   to the Court at this time that the Court feels that he has

14   not accepted responsibility to the extent the Court feels

15   should have, and that's going to be your discretionary

16   situation here today.

17       But he has remained consistent in that with me

18   throughout this from the day he first came to my office,

19   and he's always admitted freely, I did what I did with my

20   cousins, I was wrong.  I was dead wrong.

21       And when the government approached us on resolving

22   this case, they said they would dismiss the other nine

23   counts.  He would plead to that one, and he did so.

24       I understand I have explain to Mr. Cendana the issue

25   relevant conduct and how it's gotten into the scores and

1   how that is scored in this matter, and have explained to

2   him that situation.

3        But I'd like him to explain some of the other things

4   that occurred in this so the Court will have a full

5   fleshing out of what happened here.

6             THE COURT:  All right.

7             THE DEFENDANT:  Again, thank you, Your Honor.

8        If you don't mind, Your Honor, I am going to read

9   from what I prepared.

10       I thank you, Judge Conway, for giving me the

11  opportunity to express my testimony regarding the

12  circumstances that brought me here today.

13       I apologize to my cousins in California for doing

14  what I did and looking at it in a more of a sacrificial

15  lamb at that time, being that I was very concerned about

16  not only my investment, my wife's, my family members and

17  the rest of the friends in the group that we had, you

18  know, into this project.  And I was hoping that the market

19  would change.  But we needed some funds at that point to

20  finish out the restaurant, Your Honor.  In any case I

21  apologize to them and I apologize to my wife, my children,

22  my grandchild, to the government of the United States, to

23  you, Your Honor.  I apologize to my friends and other

24  people that I might have aggrieved and inconvenienced.

25       I'm asking for a chance so that I can continue to

1  work hard and help to repay my debt to my cousins and to

2  the people that I had made obligations to and to be a

3  better citizen of this community.

4      I come from a hard working family, Your Honor.  My

5  mother is a teacher for the blind for 25 years.  My father

6  is a production manager for 25 years now.  He's worked

7  very hard, put us through school, not me in particular

8  because I -- you know, school wasn't my biggest thing.

9  But my two younger brothers now is career professionals at

10 this point with a very beautiful family.

11     I was taught to praise God and live simple, work

12 hard, love and take care of my family, help others who are

13 in need, contribute to the well-being of the community,

14 and not to hurt anyone.

15     I have sponsored all ages of people, you know, from

16 kids to adults through basketball, bowling and football

17 through financial means and even just volunteering my

18 time.  You know, I helped neighbors that was under

19 foreclosure and they needed some money, and to help them

20 out of foreclosure, I lent them some money which I haven't

21 been paid back on also, Your Honor.

22     The -- what happened with the company was that we had

23 an opportunity in the beginning to possibly be a part of

24 this growing American dream of having, you know, some

25 condominiums and possibly make some money off of that, you

1   know.  And being that this was a small group of people,

2   people who knew each other, you know, we presented to

3   them.  When I say we, it's because it was a compilation of

4   me, my brother, my best friends, and, you know, and then

5   we brought in our parents, we brought in our aunts, we

6   brought in our other friends into this group of things

7   into this things that we were trying to do.

8        You know, during this time, you know, we were paying

9   Dr. Gonzalez a lot of money, Your Honor, because he wanted

10  the money.  He's a retiring doctor at that time.  He was

11  in his 70s at that time.  And he just wanted to get out of

12  his business and he just wanted to sell his property.  And

13  he sold it to me at that point, you know.  We figure that

14  it was much less than what the market was asking for.  He

15  was asking for 2.3 on 110 acres, Your Honor.  At that time

16  I think we were figuring, you know, somewhere about maybe

17  15 to $20,000 or, you know, as far as just that particular

18  property, I think.  Again, there's numbers that I

19  sometimes don't remember, but -- I do know that after the

20  due diligence and after talking with environmentalists

21  that we can possibly build up to 70 acres of that land.

22  We knew there was some part of it was wetland.

23       So we did all of our architect rendering and, you

24  know, all of our studies on 70 acres, Your Honor.  We went

25  to pre-application meetings in Osceola County, not only

1    with this group but with our group of people like, you

2    know, like my -- Roberta Rodriguez and, you know, the

3    group of people in the company who was also part investor

4    of this, you know, wanting to know how far can we go with

5    this and how good, you know, can we do this.

6         When we went to that pre-application meeting, Your

7    Honor, they said that, you know, why put in a

8    comprehensive plan now where we have a plan in place in

9    Tallahassee.  Just wait.  You can save a lot of money and

10   a lot of time.  Well, we didn't wait.  That wait actually

11   hurt us.  Because at that point we went into 2007 from

12   2006 and then into 2008, and at that point the market was

13   already tanking.  And I couldn't -- and there was a credit

14   crunch.  We couldn't get the development money that we

15   wanted.  We couldn't get the construction -- of course

16   construction money at that point.

17        But in the beginning during the due diligence in the

18   beginning, Your Honor, we had different lenders who wanted

19   to go into the development at that point, but we couldn't

20   because we didn't have the comprehensive plan in place

21   yet.  We were waiting for Tallahassee to do that.

22        With that, Your Honor, we said to ourselves, we put

23   so much money into Dr. Gonzalez's pocket and we want to

24   continue to do other things.  That's when, you know, the

25   restaurant came along.  That's when the solar system, you

1   know, project or venture tried to come along.  But the

2   solar was halted because the more concentration we had was

3   on the restaurant.  The restaurant was misbudgeted, Your

4   Honor, and we thought that we were going to be done in

5   four or five months to build out that place, maybe spend

6   only $300,000 or 250, but it didn't happen.  It cost us

7   close to a million dollars two years later.  And, you

8   know, plus the fact that, you know, with the development

9   of that 110 acres we wanted to be a one-stop shop, if you

10  will, Your Honor.  We wanted to have a mortgage company

11  and title company at the same time.  That's why we built

12  the title company, you know, having my brother Ranier

13  who's under JMC Capital as one of the managing members of

14  1st Class Title.  So -- and he manages -- he managed that

15  with, you know, with me and Donna Adriaansen.

16      Things just went bad, Your Honor, and we couldn't pay

17  this mortgage at a point.  It's because the revenue went

18  down under Cameo Mortgage Group.  You know, I put out so

19  much money already from my pocket, my wife's pocket and

20  family members, and that's why I ended up doing what I did

21  to my cousins, you know.

22      As far as, you know, as far as, you know, our group

23  of people that's, you know, that are victims, I presented

24  the best that I can.  I presented my -- not only the

25  project, but the restaurant and what we can do as far as

1   paying back their interest payments.  And we did for a

2   while.  But that failed too because of the market, Your

3   Honor.

4        So, you know, my brother did know everything, Your

5   Honor.  He knew what was going on in that company.  Even

6   Brent Dela Cruz knew.

7        My job was to find funding for the company, Your

8   Honor.  I did have some cost management on that company --

9   on those companies.  When Brent comes to me and says,

10  Hey, Ray, we need pay all this stuff because your brother

11  is yelling at me because the mortgage is still not getting

12  paid, or this guy's waiting for his interest payment.  I

13  said, do what you got to do.  You know, we have all this

14  stuff as far as flex lines.  We tried not to use any of

15  those credit lines or flex lines.  If you dare to look at

16  the records, they were on hold for a while.  We didn't use

17  them for a while until it came to a point that we had to

18  use them because everybody was yelling.

19       So -- but everyone knew.  And so I said to Brent, go

20  ahead, Brent, and do what you got to do.  So Brent went

21  ahead and pulled out those checkbooks and signed people's

22  names to make sure that one was getting paid including

23  their payroll, Your Honor, because every one's payroll was

24  in jeopardy.  You know, people were saying, hey, you know,

25  I don't -- I don't want to lose my job, Ray.  You know,

1    it's hard -- it's hard times right now.  Well, what do we

2    do?  What can you do?  So any case, um...

3        Your Honor, I confess my wrongdoing to my cousins

4    again, and I did my confession to them since the get-go.

5    I sent them by e-mail and by phone that I was guilty of it

6    and I wanted to repay them back, and I wanted to, you

7    know, show them what I had at that time which is some

8    other properties, the 110 acres, the equity -- there was

9    equity in those 110 acres, you know.  I tried to salvage,

10   you know, a lot of things, Your Honor, the best that I

11   can.  My wife and I suffered a lot, even our marital

12   status was really at a bad place at one point.  But I have

13   been given a chance by my wife too and hope that we can

14   work things out again.

15       We probably lost personally about half a million of

16   our own money, me and my wife.  We lost our primary home.

17   We're now in just a two bedroom condo by the UCF area,

18   Your Honor.  We lost -- we borrowed money also from our

19   own HELOCs and invested into this just to try, again, to

20   save not just the company but also the people that's with

21   me.  I had a moral -- I felt I had a moral responsibility

22   to these people.  I didn't want to fail.  I just didn't

23   want to fail.

24       But, you know, at the end things went bad, Your

25   Honor.  Things got worse for me.  The suffering, the

```
 1   depressions, you know, all that, the stress.  You know, I
 2   got creditors threatening me, yelling at me, threatening
 3   me with, you know, verbally and also threatening me
 4   physically and also my car's been vandalized because of
 5   this stuff.  My wife is scared, you know, of her life
 6   because of this.
 7        But, you know, I ask for your mercy.  I ask for the
 8   mercy of the government and of course the Court.  But I
 9   would like to, you know, really go out there again and
10   work very hard if given the chance to and pay all my
11   debts, Your Honor.
12        I guess that's all I can say, Your Honor.
13            MR. DOROUGH:  Your Honor, I'd like to address
14   two things very quickly.
15        If the Court sees in the presentence investigation,
16   and again I'm not trying to be beat a dead horse, the
17   reason I did -- the reason I argued on the 800,000 from
18   Regions is the government shows that Mr. Cendana has
19   $500,000 equity in that Reaves property.  That -- so I
20   felt that was inconsistent to say he had equity in it but
21   it was -- in any event, I discussed this with Mr. Cendana
22   on many occasions.  The Court's going to make the sentence
23   today it feels is appropriate.  We're going to ask the
24   Court to set the sentence as low as you feel is
25   appropriate in the circumstances.
```

1    Mr. Cendana has already told me that he wishes to

2 give me -- I'm not sure if that's going to be appropriate,

3 we may have to use somebody else -- a durable power of

4 attorney to be sure that the land is disposed of at the

5 highest possible price so that that money is available for

6 restitution to whomever the Court orders restitution to.

7    And the reason that's important is we don't want to

8 go through a foreclosure situation.  We'd rather it be

9 sold through Atlantic Realty and allow us that time to

10 make that restitution argument.

11    Lastly, Your Honor, I would ask that in the event of

12 any sentence, having talked to the pretrial release

13 people, that Mr. Cendana not be remanded today but to be

14 given a report date when the Bureau of Prisons finds an

15 appropriate place and that it be somewhere in Central

16 Florida if possible for his family members.

17        THE COURT:  All right.  I find that the

18 defendant is not entitled to acceptance of responsibility

19 because he has not truthfully admitted the conduct

20 relating to the relevant conduct, plus he's falsely denied

21 additional relevant conduct for which he's accountable.

22    So the guidelines are total offense level 29,

23 criminal history category I, 87 to 108 months

24 imprisonment, two to three years supervised release.

25    As I understand it, the only two victims who have

1    submitted information concerning restitution are the

2    Macatangays.

3         MR. IRICK:  Yes, Your Honor, that is correct.

4       Although I would advise the Court that today in the

5    courtroom are at least two additional victims, Mr. Angel

6    Rodriguez is here in the Court as is Mr. George Seckinger

7    and Mr. Wilmaro who's (phonetic) not listed in case but he

8    has appeared today in court as a victim.  I'm obligated to

9    advise the Court of that.

10        THE COURT:  All right.  I was going to ask that

11   question in a moment.  But the restitution amount is

12   $242,413.35.

13        MR. IRICK:  That is correct, Your Honor.

14        THE COURT:  $7,500 to $3,947,945.44 fine; $100

15   special assessment.

16      Are there any victims present in the courtroom that

17   wish to -- did I add something wrong?

18        THE PROBATION OFFICER:  Based on the changes,

19   the fine range would actually change.

20        THE COURT:  Okay.

21        THE PROBATION OFFICER:  It would become 15,000

22   at the low end, and the high end of that would be

23   3,555,468.72.

24        THE COURT:  So -- thank you.

25      Do you have victims who wish to speak?

1          MR. IRICK:  Yes, Your Honor.  May I just inquire

2     whether they wish to make a statement?

3          THE COURT:  Yes.

4          MR. IRICK:  One victim does wish to make a

5     statement, Your Honor.

6          THE COURT:  All right.

7          UNIDENTIFIED PERSON:  Your Honor, good morning.

8          MR. IRICK:  Please state your name for the

9     record.

10          UNIDENTIFIED PERSON:  First name is

11     G-U-I-L-L-E-R-M-O. The last name is I-R-I-A-R-T-E.

12          THE COURT:  Go ahead.

13          THE WITNESS:  Your Honor, I'm here just to see

14     that justice get served and some point just get

15     restitution of my money just like everybody else.  For

16     what I hear today, some things got misleaded, some things

17     got deviated in another way.  They could have stopped

18     things instead continue involve and involve and involve in

19     things.

20        So I understand people want to grow and people want

21     to do things, but not to expense everybody else.  You

22     know, in other words, you jeopardize other people's life,

23     other people's savings, other people's in general just to

24     perceive your goal or your situation.  If you can't do

25     things on your own, you should have stopped.  You had a

 1    chance to stop when things were going in a different

 2    direction, but you didn't.  Just continue going.  And one

 3    example is the restaurant.  They could have stopped that.

 4    They could have said, well, this is not going too well.

 5    Let's just back off.  But they didn't.  They just continue

 6    on at the mercy at the jeopardizing of other people's

 7    life, savings of people's life.

 8         That's all.  That's all I want to say.

 9              THE COURT:  Thank you.

10              THE WITNESS:  Thank you.

11              THE COURT:  Is there anything further from the

12    government?

13              MR. IRICK:  No, Your Honor.

14              THE COURT:  Anything further from the defendant?

15              MR. DOROUGH:  No, Your Honor.

16              THE COURT:  The Court has asked the defendant

17    why judgment should not now be pronounced.  After hearing

18    the defendant's response, the Court has found no cause to

19    the contrary.

20         The parties have made statements on their behalf.

21    The Court has reviewed the presentence report.

22         Pursuant to Title 18, United States Code, Sections

23    3551 and 3553 and the Sentencing Reform Act of 1984, it is

24    the judgment of the Court that the defendant, Ramon

25    Cendana, is hereby committed to the custody of the Bureau

1   of Prisons to be imprisoned for a term of 75 months.

2         Upon release from imprisonment, you shall be placed

3   on supervised release for a term of three years.

4         The mandatory drug testing requirements of the

5   Violent Crime Control Act are waived.  However, the Court

6   orders you to submit to random drug testing not to exceed

7   104 tests per year.

8         While on supervised release, you shall comply with

9   the standard conditions adopted by the Court in the Middle

10  District of Florida.

11        In addition, you shall participate in a mental health

12  treatment program for gambling and follow the probation

13  officer's instructions regarding the implementation of

14  this Court directive.

15        Further, you shall contribute to the cost of these

16  services not to exceed an amount determined reasonable by

17  the probation office's sliding scale for mental health

18  treatment services.

19        You shall cooperate in the collection of DNA as

20  directed by the probation officer.

21        You shall be prohibited from incurring new credit

22  charges, opening additional lines of credit, making

23  acquisitions or obligating yourself for any major

24  purchases without approval of the probation officer.

25        You shall provide the probation officer access to any

1   requested financial information.

2       Based upon your limited financial status, the fine is

3   waived.  In lieu of paying a fine, you shall perform 50

4   hours of community service as a condition of supervised

5   release.

6       It is further ordered that you shall pay to the

7   United States a special assessment of $100 which is due

8   immediately.

9       The mandatory restitution provision of 18 U.S.C.

10  sections 3663 (a) apply in this case.

11      It is ordered that a you shall make restitution in

12  the amount of $189,703.84 to Angelica Macatangay and

13  $52,709.51 to Raul Macatangay.  Restitution is payable to

14  the Clerk, United States District Court, for distribution

15  to the victims.

16      While in the Bureau of Prisons' custody you shall

17  either pay at least $25 quarterly if you have a nonUNICOR

18  job or pay at least 50 percent of your monthly earnings if

19  you have a UNICOR job.

20      Upon release from custody you're ordered to begin

21  making payments of $400 per month.  This payment schedule

22  shall continue until such time as the Court is notified by

23  you, the victim, or the Government that there has been a

24  material change in your ability to pay.

25      Are there any assets subject to forfeiture, Mr.

1   Irick?

2          MR. IRICK:  Your Honor, there are no assets that

3   are specifically identified at this time, no.

4          THE COURT:  The guideline range exceeds 24

5   months -- does it?  The guideline range does not exceed 24

6   months.  The Court has chosen a sentence below the

7   advisory sentencing guideline range because the amount of

8   the sentence is large; it's 75 months.  There is some

9   point in time when you need to get out and start paying

10  restitution to the victim.  So the Court has determined

11  that 75 months is sufficient but not greater than

12  necessary to comply with the statutory purposes of

13  sentencing.

14      In doing so, the Court has considered the advisory

15  sentencing guidelines and all of the factors identified in

16  Title 18, United States Code, Sections 3553(a) 1 through

17  7.

18      The Court has accepted the plea agreement because it

19  is satisfied that the agreement adequately reflects the

20  seriousness of the actual offense behavior; that accepting

21  the plea agreement will not undermine the statutory

22  purposes of sentencing.

23      The Court finds that a conviction on the additional

24  counts would not affect the offense level or any other

25  guideline computation.

1      In accordance with the plea agreement, it is ordered

2  that counts 1 through 4 and 6 through 10 of the

3  superseding indictment and the original indictment be

4  dismissed.

5      Is there any objection by the government to the

6  defendant voluntarily surrendering?

7          MR. IRICK:  No, Your Honor.

8          THE COURT:  It's further ordered that you shall

9  voluntarily surrender at your own expense at the

10  institution designated by the Bureau of Prisons on or

11  before 2:00 p.m. on June 1, 2010.

12      The Court having pronounced sentence, does counsel

13  for the defendant or the government have any objections to

14  the sentence or to the manner in which the Court has

15  pronounced sentence?

16          MR. IRICK:  Not on behalf of the United States,

17  Your Honor.

18          MR. DUROUGH:  None other than previously stated,

19  Your Honor.

20          THE COURT:  To the extent permitted by your plea

21  agreement, Mr. Cendana, you're now advised that it is your

22  right to appeal from this sentence within 14 days of

23  today's date or from the date the judgment is recorded

24  whichever is later.  Failure to appeal within the 10 day

25  period shall be a waiver of your right to appeal.

1      The government may file an appeal from this sentence.

2      You're also advised that you're entitled to the

3  assistance of counsel in taking an appeal.

4      If you're unable to afford a lawyer, one will be

5  provided for you.

6      Is there anything further?

7          MR. DOROUGH:  No, Your Honor.

8          MR. IRICK:  No, Your Honor.

9            (hearing concludes at 11:10 a.m.)

10               C E R T I F I C A T E

11      I certify that the foregoing is a correct

12  transcript from the record of proceedings in the

13  above-entitled matter.

14

15  s\Sandra K. Tremel   July 12, 2010

16

17

18

19

20

21

22

23

24

25